## WILLIAM BAKER *et al.*

### *v.*

## THE ADMINISTRATOR OF WILLIAM BACKUS, dec'd.

1. OPENING DECREE — *when only constructive service is had.* When a defendant in chancery, who has only had constructive notice of the suit, by publication, and against whom a decree has been rendered, petitions the court, under the provisions of the fifteenth section of the Chancery Act, to be heard touching the matter of such decree, it would be error to vacate or set aside the decree in the first instance, upon the application; the statute simply requires that, notwithstanding the decree, the party thus situated shall be heard.

2. RECEIVER IN CHANCERY — *definition.* A receiver is defined to be an indifferent person between the parties, appointed by the court, and on behalf of all parties, and not of the complainant or one defendant only, to receive the thing or property in litigation, pending the suit.

3. SAME — *in what cases appointed — and at what stage of the proceedings.* The power to appoint a receiver is most usually called into action either to prevent fraud, save the subject of litigation from material injury, or rescue it from probable destruction; and there is no necessity to appoint a receiver except for one of these purposes.

4. The court has no jurisdiction to appoint a receiver unless a cause is depending, save in peculiar cases, such as infancy or lunacy.

5. The fact that the stockholders of a corporation refuse to aid the company, or advance means to relieve it from pecuniary embarrassments, even when called

| 32 | 79 |
| 35a | 52 |
| 35a | 206 |

| 32 | 79 |
| 138 | 74 |

| 32 | 79 |
| 143 | 122 |
| 41a | 151 |

| 32 | 79 |
| 153 | 312 |

| 32 | 79 |
| 50a | 412 |
| 51a | 522 |

| 32 | 79 |
| 62a | 208 |

| 32 | 79 |
| 171 | 484 |

| 32 | 79 |
| 73a | 432 |

| 32 | 79 |
| 190 | 5289 |
| 190 | 20389 |

| 32 | 79 |
| f96a | 8139 |

| 32 | 79 |
| 105a | 8608 |
| e105a | 610 |

| 32 | 79 |
| 207 | 22358 |
| 110a | 6153 |

upon to do so, furnishes no ground for interfering with the corporate property, by putting it in the hands of a receiver, since it was in the power of the trustees to sell out the stock of the delinquent holders.

6. A receiver is not usually appointed before an answer is put in, unless fraud is clearly proved by affidavit, or it be shown that imminent danger would ensue, if the property is not taken under the care of the court. There must be strong special ground to induce the court to interfere in this way before an answer.

Where a default is entered, the rule would doubtless be, to require affidavits, before the property shall be taken out of the custody of its true owner.

7. SAME — *of his qualifications.* Where a receiver was appointed who was the legal adviser of the party at whose instance the appointment was made, in relation to the subject matter of the suit, and also of the owner of the property sought to be affected, and was the largest single creditor of such owner, he was held not to be disinterested. All these disqualified him, and he should not have been appointed.

8. SAME — *as to necessary parties.* It is indispensable that he, whose property is to be taken from him and placed in the hands of a receiver, should be a party to the pending suit, that he may resist the application.

9. So where a bill was filed by one of several parties interested in a common business enterprise, against the others who claimed to have become organized as a corporation, the complainant claiming that the company was not a corporation but a simple copartnership, and asking the court so to declare, and to dissolve the partnership, and appoint a receiver to take charge of the effects of the company and settle up its affairs, it was held erroneous to appoint such receiver without making the corporation, as such, a party to the suit. The court had no jurisdiction to deprive the company of its property, and dissolve it, when the company was not present to defend itself. "All bodies should be allowed the privilege of being present at their own dissolution."

10. PARTIES — *questioning the franchise of a corporation.* Any inquiry set on foot, no matter by whom, questioning the franchise of an incorporated company, renders it indispensably necessary that the corporation be made a party to the proceeding.

11. NON-JOINDER OF PARTIES — *when it is error.* The non-joinder of a mere formal party, cannot, generally, be assigned as error; but that of an indispensable party can be.

12. WHO MAY COMPLAIN *of non-joinder of parties.* When an individual member of an incorporated company exhibits his bill in chancery against the remaining members of such company, as individuals, without joining the corporation as a party, the object of the bill being to take away its franchise, the individual defendants have such an interest in this franchise as to enable them to assign as error the non-joinder of that body clothed with its exercise.

13. CRYSTAL LAKE ICE COMPANY — *a corporation.* Crystal Lake Ice Company is, *prima facie,* an incorporated company. *Tarbell* v. *Page,* 24 Ill. 47.

Baker et al. *v*. The Administrator of Backus, dec'd.

14. INCORPORATIONS UNDER THE GENERAL LAW — *by whom* — *in what proceedings* — *and for what causes, invalidated.* When a company, having taken all other steps to become incorporated under the general law, omits to file the certificate of incorporation in the office of the secretary of state, such a non-compliance with the statute might sustain a *quo warranto* or *scire facias* on behalf of the people, and oust the corporators from the exercise of their franchise, but it does not necessarily follow that it is not, as to third persons, a corporation.

15. The omission of the stockholders of a company incorporated under the general law on that subject, to hold an election for trustees on the day fixed in the by-laws for that purpose, will not authorize the dissolution of the corporation. It is lawful to hold such election on any other day, in the manner provided by the by-laws.

16. Nor will the fact that the company has failed to keep in their office an alphabetical list of their stockholders, showing their residence, number of shares and amount of stock paid in, tend to work a forfeiture of their charter. Such neglect is visited by a pecuniary forfeiture, only.

17. Nor is the fact that the company made no publication in the form of a report, in some newspaper, showing the amount of capital, the proportion paid in, and amount of existing debts, to be visited by a forfeiture. A failure to do so is made to fall on the trustees, individually.

18. Neither will the fact that one-half of the capital stock was not paid in within one year of the organization of the company, affect, in any way, the exercise of the corporate functions. Until the whole amount of capital stock shall be paid in, and a certificate thereof filed with, and recorded by, the county clerk, the stockholders are, severally, individually liable to the creditors to an amount equal to the amount of stock held by them, respectively, for all debts and contracts made by the company.

19. The fact, however, that the whole of the capital stock is not paid in within two years from the incorporation of the company, will work a dissolution of the corporation.

20. But this cannot be done by the act of one stockholder; it must be by the power granting the charter. The government creating the corporation, can *alone* institute a proceeding for the purpose of pronouncing the corporation dissolved.

21. The cause of forfeiture cannot be taken advantage of, or enforced against a corporation, collaterally or incidentally, or in any other mode, than by a direct proceeding for that purpose against the corporation.

22. Nor is the mere failure to perform the condition, *ipso facto*, a dissolution, but judicial proceedings, and a judgment of *ouster* must be had, in order to effect a dissolution.

23. The question was presented in this case, as to the jurisdiction of a court of ·chancery over a corporation, as such, at the suit of the stockholders, to control the discretion of the trustees as to the payment of the debts of the corporation, so as to relieve the stockholders from their individual liability, and to deprive the cor-

poration of its franchises; or to declare that the body was not a corporation. After an elaborate examination of the authorities, the court expressed themselves as strongly inclined against the jurisdiction, but regarded the case made by the bill in this cause, not such an one as to warrant its exercise, if possessed.

24. The allegation that a company, which claims to have become incorporated, has never been legally organized as a corporation, or has never existed as such, can be ascertained in no other way than by a direct proceeding by *scire facias*, or an information in the nature of a *quo warranto* in a court of law, and furnishes no grounds for the interposition of a court of chancery.

25. A court of chancery can be specially empowered by statute to divest a corporation of its corporate character and capacity; otherwise, in all cases, the mode of proceeding to enforce a dissolution, for a cause of forfeiture, is by one of the remedies at law mentioned.

26. A *scire facias* is proper where there is a legally existing body, capable of acting, but who have been guilty of an abuse of the power intrusted to them.

27. And a *quo warranto* is necessary when there is a body corporate *de facto*, who take upon themselves to act as a body corporate, but, from some defect in their constitution, they cannot legally exercise the power they affect to use.

28. STOCKHOLDERS OF A CORPORATION — *are not partners.* The stockholders of a company incorporated under the general law, are not partners, even as between themselves.

29. The common law liability of copartners extends to all the copartners jointly, in the first instance, whereas by this general law of incorporation, it is made several against each stockholder, and then is made dependent upon certain contingencies.

30. In ordinary partnerships, the members are primarily bound for all the liabilities of the concern; by the statute, the members of these incorporated bodies are not so bound, and these constitute a great difference between these associations and copartnerships.

31. STOCKHOLDERS — *under what law responsible.* The stockholders of such a corporation, can be held responsible only in the mode prescribed in the act under which they became associated as a corporation. They are not individually liable, except under the circumstances, and for the time, specified in the act of incorporation.

32. LIMITATION — *as to stockholders.* So it seems the question whether a proceeding against a stockholder is barred by limitation, would not be determined by the general limitation law of five years, but by the provisions of the act under which the company became incorporated, which prescribes the time of a continuance of the liability, within which it must be enforced.

33. And it is apprehended a plea by a stockholder, who has ceased to be such, that the cause of action did not accrue within two years after he had ceased to be a stockholder, that being the time prescribed in the act for the continuance of his liability, would be held to be a good plea.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. GEORGE MANIERRE, Judge, presiding.

This case is sufficiently stated in the opinion of the Court.

Mr. W. T. BURGESS, for the plaintiffs in error, contended that the Circuit Court, as a court of chancery, had no jurisdiction of the suit — being an attempt to take the property of a corporation out of its hands at the instance of one of its corporators, and assume the management and control of it by an officer appointed by the court. Citing *Foss* v. *Harbottle*, 2 Hare (24 Eng. Ch. R.), 461; *Mozeby* v. *Alston*, 1 Phillips (19 Eng. Ch. R.), 801; *Lord* v. *The Gov. and Company of Coppermines*, 2 Phillips (22 Eng. Ch. R.), 752; *Vestry* v. *Barksdale*, 1 Strobhart, 202; *Hodges* v. *New England Screw Co.*, 1 Rhode Island, 351; *Verplanck* v. *Mer. Ins. Co.*, 1 Edw. 84; 2 Paige, 438; *Attorney-General* v. *Bank of Niagara*, 1 Hopkins, 361; *Attorney-General* v. *Utica Ins. Co.*, 2 Johns. Ch. R. 389.

2. Coventry should not have been appointed the receiver, as he was the legal adviser of the complainant, and also of the company, and at the same time the largest single creditor of the company.

Mr. C. BECKWITH, for the defendants in error.

1. The complainant and defendants were *quasi* partners. The provisions of the statute requiring a suit to be brought against the corporation in the first instance, and within a certain time, are to be regarded as limitations upon their liability as partners. As between themselves, the stockholders have the rights of partners, and their liability to each other stands upon the same footing as though they were not incorporated. *Corning* v. *McCullogh*, 1 Comst. 47; *Ketchum* v. *Bank of Commerce*, 3 Law. Reg. 145; *Middletown Bank* v. *Magill*, 5 Conn. 28; *Moss* v. *Averill*, 6 Seld. 449. In the case of a copartnership for a definite period, a majority of the partners have ordinarily, during that period, the power to bind the minority against their will; but when the scheme for which the partnership was formed, fails, or becomes impracticable, the power

of such majority will be annulled by a decree dissolving the copartnership. So, in the present case, the purpose for which the company was organized having become impracticable, any stockholder had a right to have its affairs wound up. *Jennings* v. *Baddeley*, 3 Kay & Johns. 78.

2. The property of every corporation is a trust fund in the hands of its managing officers, who are trustees for the stockholders. The creditors of a corporation have an absolute right to have its property appropriated to the payment of their demands. The managing officers, as trustees, are in duty bound to make such appropriation, and a neglect or refusal so to do entitles a creditor to come into a court of equity to have such appropriation made. Angell & Ames on Corp. 663, *et seq.*; *Vose* v. *Grant*, 15 Mass. 505; *Wood* v. *Dummer*, 3 Mason, 308; *Curson* v. *African Co.*, Skinner's R. 84; *S. C.*, 1 Vernon, 121. The stockholders had a right to have the funds of the company appropriated in discharge of its liabilities, and in exoneration of their individual liability, and the neglect of the trustees to make such appropriation was a breach of trust which entitled any of the stockholders to come into a court of equity and have the appropriation made. *Dodge* v. *Woolsey*, 18 How. 341; *Sears* v. *Hotchkiss*, 25 Conn. 171.

3. The court had power to preserve the property of the company from waste and destruction, and to prevent irreparable injuries to it, and, perhaps, no circumstances could exist more urgently calling for the exercise of such a power. *Laurence* v. *Greenwich Fire Ins. Co.*, 1 Paige, 587.

4. The trustees of the company received notice of the proceedings four days before the confirmation of the receiver's report of sale. No objection was interposed. A return of the property, or of its proceeds, which have all been paid over to the creditors, is not expected, but it is supposed that such reversal will enable the plaintiffs in error to sue the officer of the court who executed its decree. It is submitted, that the court will not reverse an executed decree under such circumstances. *Curtiss* v. *Brown*, April T., 1863.

5. It is not material to consider whether the Crystal Lake Ice Company, *eo nomine*, was a necessary party. The nonjoinder of the company cannot be assigned as error by the plaintiffs in error.

6. There is a marked distinction between the powers of a court of equity and the proper exercise of those powers. A court of equity is one of general jurisdiction, and, as such, has power to grant injunctions and appoint receivers in all cases; but it does not follow that the court will take cognizance of all cases, nor that it will grant an injunction or appoint a receiver in every case. It is sometimes material to observe the distinction between the power of the court and the cases of which it will take cognizance. Such cases as a court of equity takes cognizance of are said to be within its jurisdiction, for the reason that the court takes cognizance of them; and such cases as the court will not take cognizance of are said not to be within its jurisdiction, for the reason that the court will not take cognizance of them. But it will be borne in mind that the court is the judge of what cases it will take cognizance. The power of the court does not depend upon whether the case presented is one of which it will take cognizance, nor upon its equity. The same rules apply to the orders and decrees of courts of chancery in this country, as to those of England. There, the power of the lord chancellor was the power of the crown to administer justice between its subjects, and did not, in any manner, depend upon his judgment whether he would take cognizance of the complaint personally, nor upon the merits of such complaint. If the exercise of the power was, for any reason, improper, it was only an error of judgment, and never rendered the decree void. The court below had power to appoint a receiver to take charge of the property mentioned in the bill, whether the Crystal Lake Ice Company was before the court or not. *Evans* v. *Coventry*, 31 Eng. Law and Eq. 436; *Gray* v. *Chaplin*, 2 Russ. 145; *Malcolm* v. *Montgomery*, 1 Hogan, 93. If the Crystal Lake Ice Company was aggrieved by the order appointing a receiver, it should have applied to the court and obtained an order for the redelivery of the pro-

perty.   The order requiring the receiver to take possession
of the property of the Crystal Lake Ice Company, if an error,
is not an error of which the plaintiffs in error can complain.
The order appointing a receiver was not a final decree from
which an appeal could be taken.   3 Daniell's Ch. Pr. 1984;
2 id. 1269, *et seq.*

7.   The final decree in the court below was rendered on the
17th day of December, 1857, and all errors in such decree, and
prior to that time, are barred by the statute of limitations.  ·

Mr. Justice Breese delivered the opinion of the Court:

The questions presented by the record render a full state-
ment of the case necessary.   It was as follows:

On the first day of July, 1857, one William Backus filed a
bill in chancery, in the Cook Circuit Court, against certain
persons named therein as defendants, alleging that they had,
on the 15th of December, 1855, associated themselves together
and purported to form a corporation for manufacturing, cut-
ting, working, vending and dealing in ice, under the name of
" the Crystal Lake Ice Company," and for that purpose they
had filed in the office of the clerk of the county of Cook, the
required certificate of incorporation, duly acknowledged by
them before a notary public, under his notarial seal; that
complainant was the owner of twenty-five shares, and that
485 shares had been taken, leaving only fifteen shares undis-
posed of, upon which assessments had been levied, of sixty
dollars on each share, amounting in all to twenty-nine
thousand one hundred dollars, upon which twenty-three
thousand and fifty-five dollars had been paid.

The names of the holders of the stock were set forth in a
schedule attached to the bill; and it was alleged that assess-
ments had been levied on the stock, and each and all of the
stockholders were in default, and that transfers of stock had
been made by different stockholders to other persons without
the knowledge or consent of the complainant; that since
filing the certificate, the associates who signed it purported to
organize the company by the election of one of their number,

Amos Page, as president, and another of them, George P. Clark, as treasurer and secretary, who having subsequently resigned, Alexander C. Coventry, not a stockholder, was appointed treasurer and secretary; that in consequence of removals and changes of residence, on the 30th of March, 1857, the company had no trustee who was a citizen of the State; that, by the by-laws of the company, the stated meeting of the stockholders was to be held at its office, in Chicago, on the first Monday of November, annually, and the trustees were to be elected annually at each meeting; that no annual meeting was held on the first Monday of November, 1856, and the secretary did not give thirty days' notice of a meeting as required by the by-laws, and the trustees pretended to hold over without an election; that at a meeting of the stockholders on the 15th of June, 1857, four of the trustees were removed from office, and one of them resigned, and three residents of this State were elected trustees in their place.

The bill stated that the company had not complied with the act of February, 1849, in this, that they had not kept an alphabetical list of their stockholders, showing their residence, number of shares, and amount of stock paid in, in their office; that they had never published, in any newspaper, a report showing the amount of capital, the proportion paid in, and amount of existing debts; and that one-half of the capital stock was not paid in within one year of its organization, and has not yet been paid in; that the company had never engaged in any manufacturing, agricultural, mining or mechanical business; but had been engaged in cutting and vending ice, and that there was no such business known as manufacturing ice; that the company had never been legally organized as a corporation, and had never existed as a corporation; but as a matter of fact, it had been, since its organization, a general copartnership, and that the property of the company was then held as general partnership property; that if it was ever legally organized, and ever existed as a corporation, it ceased to exist as such on the 15th day of December, 1856, because one-half of the stock of the company had not been paid in on that

day; the bill charged that the property was then held as partnership property, and the members of the company were severally liable for the debts of the company as copartners.

The bill stated, that soon after the formation of the company it commenced cutting ice and erecting ice houses at Crystal Lake, for storing ice, and purchased some small pieces of land to place them on, and also for a roadway for a railroad track from the ice house to the Chicago, St. Paul and Fond du Lac Railroad, the title to all which was taken to Amos Page and held by him as trustee for the company; that they graded and laid a track about fifteen furlongs in length, at great expense, and without regard to the true interests of the stockholders; that the company did business during the year 1856 at a loss of more than six thousand dollars, and that during the past winter the company cut and stored ice at a great expense, and in the spring of 1857 purchased horses, wagons, harness and other articles, to deliver ice in Chicago, and proceeded to erect houses and fences, which were nearly completed, for stabling horses and storing wagons; that the company was continuing the business at a monthly loss of five hundred dollars; that it was greatly in debt, owing seven thousand dollars, and the stockholders refused to help the company or advance the money to relieve it from its embarrassments.

The bill stated, that in April, 1857, judgment was obtained by Wilcox, Lyon & Co. against the company for four hundred and twelve $\frac{25}{100}$ dollars and costs, upon which execution had issued and was in the hands of the sheriff, and the personal property of the company liable to be seized and sold under it.

The bill stated, that the creditors of the company had been long delayed and were threatening to commence suits, and that notes and acceptances of the company were maturing and no provision made to meet them; that the laborers employed, whose wages were not paid, were, some of them, " on a strike " and refused to permit others to work, and the company had no means to pay them; that the property, except the real estate, was of a perishable nature, and if sold at forced sale would not pay the demands against the company, but would then, at

a fair sale, realize more than sufficient to satisfy all demands, but if held until the season was past, could only be held at an expense to the company and depreciation upon its amount and value, as it could not then be sold for as much as it could be at that time; that a large portion of the property consisted of ten thousand tons of ice, which, if carried over, or into the warm weather, would deteriorate in value and lessen in amount. The horses were an expense and the company were hopelessly insolvent, and if the property was not sold by a receiver to pay the debts, then it would be sacrificed at sheriff's sale, to satisfy judgments against it; that the real estate was of little value except for the ice business, and it would be greatly for the interest of all parties concerned it should be sold with the other property; that of the 485 shares of stock, 312 of them are held by non-residents, and the remaining 173 shares are held by twelve persons, except complainant, who reside in this State, two of whom live in the county of Cook; that all the shareholders of the company had been advised of its condition and failed to aid it.

The bill charged that the affairs of the company were daily becoming more embarrassed, and could not continue in business for the reasons stated, and that it was necessary for the protection of the rights and interests of the creditors, as well as of the stockholders of the company, that a receiver should be appointed, who should have power to take into his possession all the property of the company, real and personal, and should have full power and authority to make a present sale of the effects, both real and personal, on the best terms that could be obtained for them, and that the proceeds should be applied, first, towards the payment of the debts of the company. That, owing to the great number of shareholders, and so many of them residing out of the State, it was impossible to close the com pany without the interposition and aid of a court of chancery.

The bill stated that at a meeting of the stockholders, held at their office, in the city of Chicago, on the 13th June, 1857, the holders of 314 shares being present or represented, a resolution was passed unanimously, as follows:

That the trustees, or a majority of them, have full power and authority, if in their discretion it is advisable so to do, to sell all the lands, houses, horses, wagons, harnesses, tools, ice fixtures, and all other property of the company, on such terms and conditions as may seem to them best for the interest of the company; provided such sale shall be for a sum not less than ten thousand dollars.

The bill stated that subsequently, on the same day, the trustees levied an assessment on the stock of the company, payable in ten days, and the secretary was directed to notify, forthwith, each shareholder of this resolution, and to inform them, at the same time, if the assessment was not properly responded to within ten days, by the holders of two-thirds of the stock, that the same, and all its property, real and personal, would be sold by the trustees under the power conferred by the resolution. That the secretary did, forthwith, notify the shareholders, as he was directed to do, and that no one of them responded to the call.

The bill stated that a majority of the trustees were now absent from Chicago, and from the State, and complainant had no means of knowing when a majority of them would return to the city. That the company could not be well and safely closed up by the trustees, and the property of the company safely sold under the resolution above recited. That he, complainant, was a person of small means, and was daily in danger of being compelled to meet and satisfy the demands existing against the company, by reason of his being a general partner in the same, and because the holders of the stock residing in Cook county were also persons of small means, and not able to satisfy the demands against the company, and that the bill was filed as well to protect the complainant's interest as the interest of all the creditors of the company and its several members.

The bill prayed for the answers of the defendants under oath, and that the company might be declared, by a decree of the court, to be a general copartnership. That a receiver might be forthwith appointed, who should be empowered forthwith to take and receive all the property of the company, real and personal,

into his possession, and proceed to dispose of it, at such times and on such terms as might be most advantageous for the interest of the creditors and stockholders, if they should be declared stockholders, or partners, if they should be declared to be of the company; and that Amos Page be directed and compelled to convey to the purchasers, all and singular, the real estate of the company held by him or standing in his name, of right belonging to the company.

The bill further prayed that if the company should be declared to be a corporation, to direct and order it to be closed up and dissolved, according to law and the practice of the court. That the receiver be at liberty to apply to the court for further directions, and to proceed to pay all just demands against the company out of the proceeds of the sale, first applying the same to the costs and expenses of the proceeding and his charges, and that the surplus, if any, be brought into court, and that the defendants, either as shareholders or as trustees of the company, be enjoined from proceeding any further with the company, or with interfering with the company or its property, and from disposing of its property, goods or effects, and for further or other relief.

The bill was sworn to on the 30th day of June, 1857, by the complainant, accompanied by an affidavit of Alexander C. Coventry, stating that he was the secretary and treasurer of the company, and that the facts charged in the bill were true.

On the first day of July the bill was filed, and on the same day an order of court was entered, appointing Coventry receiver of all the property and effects, real and personal, of the company, and empowering him to take into his possession all the property of the company, and to proceed and sell it at public or private sale, as to him might seem most advantageous for the interests and for the protection of the rights of the creditors and shareholders or partners of and in the Crystal Lake Ice Company; terms and conditions of the sale at the discretion of the receiver; and to pay the debts of the company out of the proceeds, and to report his proceedings to the court, and to proceed to complete the buildings then in course of erection by the company.

On July 3d, the receiver filed his bond. On July 4th, the injunction was served on a part of the defendants, and others not found. On July 7th, the receiver filed his report, stating that, being advised and satisfied that the property could not be sold at public sale, he received offers from various individuals, and offered the property to others, refusing to make any offers. That the highest offer he could get, was one of ten thousand dollars from Hiram Joy and Augustus N. Frisbie, payable in certain installments, the last one, of twenty-five hundred dollars, payable Jan. 1st, 1859, which he deemed best for the interest of all parties, should be accepted. He thereupon prayed for an order confirming the sale, and stated that, in order to make the sale, he promised to complete the barn and fence then in process of erection, which could be done for two hundred dollars, and prayed an order directing them to be completed.

On July 8, on filing the report and on reading affidavits of Tarbell, Mehring and Stone, the report was confirmed, and a bill of sale and deed ordered to be made to the purchasers, and that the receiver complete the barn and fence, and pay for them out of the proceeds of the sale.

Defendants were notified, some by personal service of summons, and others by publication under the statute, when, on the 15th of October, the default of the defendants was entered and the cause referred to the master to take proofs.

Two weeks thereafter, October 29th, Coventry presented his petition to the court, stating his appointment on the second of July, of receiver of the company; that he was not, and had not been, a shareholder or partner in the company, but at the time of his appointment, the company was justly indebted to him $3,670.59, for moneys lent and services rendered it, and that the same was still due to him, whereupon he prayed a reference to the master to report the amount due, which was done on the same day.

The master made his report, containing the testimony of Coventry, who was the only witness examined before him on behalf of complainant, in which it appears that he had been the legal adviser of the company since its organization; that

in March, 1857, he was elected temporary treasurer and secretary of the company, and on the first of July of that year appointed receiver. States that the company was organized under the act of February 10, 1849, by filing a certificate in the clerk's office of Cook county, of the election of certain persons as trustees, and other officers of the company, gives a history of its official doings, and of its financial affairs; states that $20,797.80 was paid into the company by the shareholders; and in a schedule gives a statement of the real estate of the company, the legal title to which he said was in Amos Page.

The report also contains the testimony of Hayden, the bookkeeper of the company, stating the debt due from the company to Coventry, for money advanced, between April 7 and July 2, 1857, at $2,670.69, and that the company was indebted to Coventry $1,000 for services as treasurer, and thinks the charge a reasonable one.

On December 17, 1857, a final decree was entered, setting out in full this report of the master, and also an order that it stand confirmed, and recites that, though it appeared to the court that the defendants and complainant did business as a corporation, created under and in pursuance of the act of February 10, 1849, under the name of "The Crystal Lake Ice Company," they were never legally organized as a corporation, in pursuance of that act, and never complied with the requirements of that act, but that they were doing business as a general copartnership, under the name and style of the Crystal Lake Ice Company, and thereupon ordered and decreed that the Crystal Lake Ice Company be decreed to have been a general copartnership, composed of the defendants and the complainant.

The decree then recites that this copartnership was insolvent, and its managing members neglected the business of the company, and then orders that the copartnership be dissolved; that the injunction issued in the cause be made perpetual, and that the defendants should forever desist and refrain from proceeding with, or intermeddling with the Crystal Lake Ice

Company, its property or effects, &c., accounts, vouchers, books of account, and, all and singular, the property, both real and personal, of the company; that the order made appointing Coventry receiver be confirmed and made perpetual, and that he proceed to continue to pay the debts of the company, according to the prayer of the bill, and report of the master.

The decree then recites the sale made by the receiver, and the moneys received and paid out by him, and orders that his acts therein stand confirmed, and finds that the company are indebted to Coventry in the sum of three thousand six hundred and seventy $\frac{59}{100}$ dollars, and directs that he pay himself out of the funds in or coming to, his hands as receiver.

The decree then finds that Amos Page, one of the defendants, holds the legal title to the real estate described, which belonged of right to the company, and that since the sale to Joy and Frisbie, he has refused to convey to them, and orders that Page convey all his right, title and interest to Joy and Frisbie, and on his failure, then that the master execute such conveyance, and that the costs of the case be paid out of the property of the company.

Subsequently, on July 13, 1858, Wheat, one of the defendants, filed his petition, setting forth that he had not been served with notice of the suit, but brought in by publication, and prayed that the decree might be opened and set aside under the statute, and he be let in to defend.

On March 21, 1859, this petition was allowed, and the decree vacated as to him, and he put in a general demurrer to the bill. The other defendants thereupon, on Oct. 19, 1861, filed a petition to set aside the decree as to all of them, stating in their petition, that Wheat had filed a petition to vacate the decree, which had been allowed, and that he had filed a demurrer to the bill for want of equity, which was pending, that the decree was a joint one, and that upon the face of the record, the court had erred in rendering the decree, they therefore prayed the court to review and reverse the decree and set it aside, which was denied.

This decree is brought here on writ of error, and the

Baker et al. *v.* The Administrator of Backus, dec'd.

following errors assigned: 1. That the Circuit Court had no jurisdiction of the case made by the bill. 2. Because the ice company was not made a party. 3. The Circuit Court had no power to appoint a receiver, and authorize him to take the property of a party not before the court. 4. That when the decree was opened as to Wheat, it should have been as to all, and the suit dismissed.

We will consider these objections in a reverse order of their assignment, for reasons which will hereafter appear, and first, as to vacating the decree on the application of Wheat.

It will be seen by the record, that Wheat was not in court, except by publication or constructive notice, when the decree was passed against him. But the fifteenth section* does not require the court, to whom the application is made, to set aside, or vacate the decree entered, but only, notwithstanding the decree, that the party who has not been notified, may be heard. It was error in the court to set aside the decree against Wheat, and we would only extend the error, if we should set aside the decree as to the other defendants, it having been improperly set aside as to one of them.

The next question is, was it competent for the Circuit Court to appoint a receiver as the case stood in that court?

This power to appoint a receiver is most usually called into action either to prevent fraud, save the subject of litigation from material injury, or rescue it from threatened destruction. A receiver is defined to be an indifferent person between the parties, appointed by the court, and on behalf of all parties, and not of the complainant or one defendant only, to receive the thing or property in litigation, pending the suit. Edw. on Rec. in Chan., 3.

In the English chancery, it is held that a suit must be pending, save in peculiar cases, such as infancy or lunacy, before a receiver will be appointed. *Anonymous,* 1 Atkyn's, 578; 2 id., 315, *ex parte Whitfield.*

---

* Rev. Stat., 1845, 95, ch. "Chancery."

Lord HARDWICKE, in the last case, says expressly, "the court has not a jurisdiction to appoint a receiver unless a cause was depending; the jurisdiction which a court exercises with respect to idiots and lunatics is a particular one."

The necessary implication from all these, is, a suit being necessary, and the receiver appointed for all the parties to it, that he whose property is to be taken from him and placed in the power of a receiver, should be a party to the pending suit. We think it is indispensable he should be a party that he may resist the application, the granting of which may work to him irretrievable injury.

The appointment of a receiver to take the property of the ice company into his possession, to be disposed of by him on his own terms, the company not being made a party to the suit, no fraud being charged and no imminent danger of loss or injury to the property shown, was illegal, unauthorized, and contrary to the plainest principles of justice, which demand that every one whose property is taken from him, shall be a party to the proceedings and be heard in resistance. The court had no jurisdiction to deprive the company of its property and dissolve it, when the company was not present to defend itself. All bodies should be allowed the privilege of being present at their own dissolution. The counsel for the defendant in error insists that this objection cannot be taken by the plaintiffs in error; that if the non-joinder of the ice company be an error, it is one of which they cannot complain.

The non-joinder of a mere formal party cannot, generally, be assigned as error, but that of an indispensable party can be. The object of the bill in this case, was to take away a franchise in which these plaintiffs have a property and interest, without giving the corporate authority an opportunity to be heard. This franchise may be of more value than the property and effects of the company. The plaintiffs in error, we think, had such a property and interest in this franchise, of which the decree deprives them, as to enable them to assign as error the non-joinder of that body clothed with its exercise, and to whom, in legal contemplation, all the property and effects

belonged. The stockholders as such, were not the owners of this property, nor were the trustees; it belonged to the company as a corporation, and of which they were in the full use and enjoyment by their officers and agents, appropriating it to the purposes and objects of their incorporation, at the very time they were, without notice, deprived of it.

The defendant also contends that the ice company was not, in fact, a corporation, and therefore need not be made a party. This point has already been decided by this court in the case of *Tarbell* v. *Page*, 24 Ill. 47. Tarbell brought his action against Page, and other individuals, as stockholders in this ice company, for his salary as superintendent of the business of the company. The declaration was framed on the eighteenth section of the act of February 10, 1849, which provides that the stockholders of any company organized under the provisions of that act, should jointly, severally and individually, be liable for all debts that might be due and owing to all their laborers, servants and apprentices, for services performed for the corporation.

The court below found against the plaintiff, and this court held that this ice company was, *prima facie*, an incorporated company, was acting as such, and had taken some of the steps to become incorporated, and had entered upon the exercise of the franchise pertaining to such a body. The failure to file the certificate in the office of the Secretary of State, whilst it might be such a non-compliance with the statute as would sustain a *quo warranto* or *scire facias* on behalf of the people, and oust the corporators from the exercise of their franchise, it did not necessarily follow that it was not, as to third persons, a corporation.

It may be said this defendant is not in the position of a third person, but, being a stockholder, can, by bill, make the question of regularity of incorporation. If this be admitted, then it is very clear the company assailed should be a party to the attack. Any inquiry set on foot, no matter by whom, questioning the franchise itself, renders it indispensably necessary that the franchise should be heard.

13

It was error, then, to appoint a receiver and decree against the corporation without having made it a party to the proceedings, and these plaintiffs, having a common interest in the franchise, which has been taken from them, can complain of the error.

The important question in the case remains to be considered. Had the Circuit Court jurisdiction of the case made by the bill to render the decree of December 17, 1857?

We shall consider this question in connection with the case of *The Crystal Lake Ice Company et al.* against the same defendant in error, which has been argued and submitted on the same assignment of errors. The record before us in that case shows that, on the denial of the motion of the defendants (plaintiffs in error here) to set aside the decree, and sustaining the demurrer of Wheat to the bill, the complainant immediately entered a motion for leave to make the company a party defendant, and leave was given him to file a supplemental bill, which he did, making the company a defendant.

We will not pause to consider the various objections taken to these proceedings in the form they assumed, but proceed at once to discuss the question of jurisdiction, as that is vital.

The defendant contends that his intestate and the plaintiffs in error were *quasi* partners, and as between themselves, the stockholders, have the rights of partners, and their liability to each other stands upon the same footing as though they were not incorporated. That these parties are not partners is apparent from the act of February 10, 1849, under which they associated.

By that act, § 23, a stockholder is not personally liable for the payment of any debt contracted by a company formed under the act, which is not paid within one year from the time the debt becomes due, unless a suit for the collection of such debt be brought against the company within one year after the debt became due, and no suit can be brought against a stockholder, who ceases to be a stockholder, for any debt contracted by the company, unless the same is commenced within two years from the time he has ceased to be a stock-

holder, nor until an execution against the company shall have been returned unsatisfied, in whole or in part.

The common law liability of copartners, extends to all the copartners jointly in the first instance, and continues six years, whereas by this act it is made several against each stockholder, but it cannot be enforced while he remains a stockholder, unless a suit is brought against the company within one year after the debt became due, and when he ceases to be a stockholder, suit must be brought against him within two years from the time he so ceases; and, in addition thereto, an execution against the company must have been returned unsatisfied, in whole or in part.

In ordinary partnerships, their members are primarily bound for all the liabilities of the concern; by the statute they are not so bound, and these constitute a great difference between these associations and copartnerships.

We are aware that the Court of Appeals of New York have held that a creditor of one of these corporations may, after judgment obtained against the corporation and execution returned unsatisfied, sue any of the stockholders and recover his demand, and that such stockholders are liable in an original and primary sense, like partners or members of an unincorporated association; this would be the case here, were it not for our statute.

The case of *Corning* v. *McCullough*, 1 Comstock, 47, turned upon the question whether a bar to a proceeding under the statute of New York against a stockholder of one of these companies was to be determined by the general limitation law of six years, or whether the action brought to fix the liability was not an action on the statute, and so governed by another law fixing the limitation of actions upon a statute to three years. If the limitation had been in the law, as it is here, there does not seem there could be a doubt on the question. The stockholders of such a corporation can be responsible only in the mode prescribed in the act under which they become associated as a corporation. They are not individually liable, except under the circumstances and for the time speci-

fied in the act of incorporation. We apprehend a plea by a stockholder, who had ceased to be such, that the cause of action did not accrue within two years after he had ceased to be a stockholder, would be held to be a good plea, and if proved would discharge him from liability. How can it be that a stockholder shall be bound beyond his undertaking? Those who contract with the company, and become its creditors, know the extent of the liability of each stockholder, and how long it is to continue, and they know what will discharge them from liability. The credit is, unquestionably, given to the company; the contract is with the company, with a liability over on the stockholders under certain circumstances. The time of its continuance, within which it is to be enforced, is a part of the contract, and known and understood by both parties. To this extent it would seem the bar of five years interposed by the general law, would be overleaped by this act, and two years be held the limit, as to time, of a stockholder's responsibility.

The case of *The Middletown Bank* v. *Magill*, 5 Conn., 28, was decided upon this clause in the charter of the bank: "The persons and property of the members of the corporation shall, at all times, be liable for all debts by said corporation." No one will doubt that this clause is but an avowal of the true principle of a partnership, and all who deal with such companies look for their security, as much to the individual members, as to the joint stock; but the case is widely different with these parties, they being responsible to those who deal with them, in a limited degree only, not "at all times," but for a limited time.

These parties then are not to be considered as copartners; but as a company incorporated with certain powers and privileges, in possession of a franchise of which they cannot be deprived, on the application of one or more dissatisfied members. There is no sufficient proof going to show that the purpose for which the company was organized had become impracticable, or that its officers were neglecting their duties, or violating in any way the terms of the association. The

most that can be said is, that they were not making money, but losing it, yet their affairs could not have been very desperate, since only one person, or firm, had recovered a judgment for a small amount against them, and its mass of creditors had not instituted suits. The proceedings were instituted, too, and brought to a conclusion in the first days of July, at a time when the article they were dealing in was in great demand. But of this more hereafter.

The defendant contends that the stockholders had a right to have the funds of the company appropriated in discharge of its liabilities, and in exoneration of their individual liability, and the neglect of the trustees to make such appropriation, was a breach of trust, which entitled any of the stockholders to come into a court of equity and have the appropriation made. What number of stockholders must be comprehended under the term any? Must it not be more than one? Can one dissatisfied, or litigious stockholder, arraign the company in court, and compel it to act contrary to the judgment of its directors? We are inclined to think a stockholder has no such powers. The cases cited under this head do not go to that extent. In *Dodge* v. *Woolsey,* 18 How. (U. S.), 341, all that was decided on this point was, that a stockholder in a corporation has a remedy in chancery against the directors, to prevent them from doing acts which would amount to a violation of the charter, or to prevent any misapplication of their capital or profits, which might lessen the value of the shares, if the acts intended to be done amount to a breach of trust or duty; so he has a remedy against individuals in whatever character they profess to act, if the subject of complaint is an imputed violation of a corporate franchise, or the denial of a right growing out of it, for which there is not an adequate remedy at law; therefore, the court held, when the directors of a bank refused to take proper measures to resist the collection of a tax which they themselves believed to have been imposed upon them in violation of their charter, this refusal amounted to a breach of trust, and a stockholder had a right to file a bill in chancery asking for such a remedy as the case might require.

The case of *Sears et al.* v. *Hotchkiss et al.*, 25 Conn. 171, was a bill in equity brought by the plaintiffs who were stockholders of a trading corporation, and a part of them directors, against the remaining stockholders, who held a majority of the stock, and were a majority of the directors of the corporation, to which the corporation itself was made a party, charging the defendants with fraudulent mismanagement of the business of the company, for their own private benefit, and with being largely indebted to the corporation for funds improperly withdrawn by them, the amount of which they concealed, and charging a fraudulent combination for these purposes, and praying for a disclosure, an account, a decree that the defendants pay to the corporation whatever should be found due, and an injunction against their selling or wasting the property. The court held, that it was no objection to the bill that the corporation itself could have maintained an action at law for the injury against the defendants, nor that the plaintiffs had a remedy at law by a suit against the corporation, and that the bill, both as to the equity it disclosed and as to the parties, was sufficient. These cases cited by the defendant in error fall far short of the case we are considering, and are of a different nature, and only favor the proposition that stockholders can implead their corporation in a suit in equity. These are all the cases on this point to which defendant's counsel has referred.

There is no charge in this bill of fraud or collusion, or neglect of duty, or of indifference by the trustees towards the objects of the incorporation, proved. The fact is established, on the contrary, that at the moment of the appointment of the receiver, the company was in operation by its officers and agents, from whose hands and possession the receiver took the property in one day after his appointment, sold it the next, privately, made his report in three days thereafter and obtained a confirmation of all his acts on the succeeding day. Let not a court of chancery after this be charged with creeping at a snail's pace to results, when here is seen a case where property valued at many thousands has been taken out of the possession of its owners, sold to others, and the whole proceeding con-

summated by a confirmation in less than seven days ! We do not believe a case like it can be found in the books.

We are referred by plaintiff's counsel to cases in the English chancery, where it was held that a court of equity cannot assume jurisdiction in such cases, without opening its doors to all parties interested in corporations, or joint stock companies, or private partnerships, who, although a small minority of the body to which they belong, may wish to interfere in the conduct of the majority. This, the court say, cannot be done, and the attempt to introduce such a remedy ought to be checked for the benefit of community. *Lord* v. *The Gov. and Co. of Copper Miners*, 22 Eng. Ch. R. 750. The bill, in that case, alleged no fraud, but the complaints made by the individual shareholders, all consisted of acts within the powers of the corporation, and all sanctioned by general meetings of the shareholders, and no allegation, raising any case for the interference of a court of equity with the exercise of such rights.

In conclusion, the court, Lord Chancellor COTTENHAM, said, " there is no case that calls upon this court to entertain such a suit, and the evils of doing so, I think, would be very serious."

Reference is made to *Foss* v. *Harbottle*, 24 id. 461. That case was a bill filed by two of the stockholders in a company incorporated by act of Parliament, on behalf of themselves and another, the proprietors of shares, except the defendants, against the five directors, three of whom had become bankrupt, and against a proprietor who was not a director, and the solicitors and architect of the company, charging the defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted; that there had ceased to be a sufficient number of qualified directors to constitute a board; that the company had no clerk or office; that in such circumstances the proprietors (stockholders) had no power to take the property out of the hands of the defendants, or satisfy the liabilities or wind up the affairs of the company.

The bill prayed that the defendants might be decreed to make good to the company the losses and expenses occasioned by the

acts complained of, and praying for the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus.

On demurrer to this bill, the defendants insisted on the argument that the individual members of the corporation could not, in any case, sue in the form in which the bill was framed.

The vice-chancellor, Sir JAMES WIGRAM, said : " I think there are cases in which a suit might properly be so framed. Corporations like this, of a private nature, are in truth little more than private partnerships ; and, in cases which may easily be suggested, it would be too much to hold that a society of private persons, associated together in undertakings which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se,* because, in order to make their common objects more attainable, the crown or the legislature may have conferred upon them the benefit of a corporate character." But, he says, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from ; rules which, though in a sense technical, are founded on general principles of justice and convenience. He held, in this case, that the plaintiff could not sue in a form which assumed the practical dissolution of the corporation, and sustained the demurrer to the bill.

In *Mozley* v. *Abeton,* 19 id. 790, which was a bill filed by two members of an incorporated railway company, in their individual characters, against the corporation, and twelve other members, who were alleged to have usurped the office of directors, and to be exercising the functions thereof, as a majority of the governing body, injuriously to the interests of the company, and praying that those twelve directors might be restrained from acting as directors, and be ordered to deliver up the common seal and the property and books of the company in their possession to six other persons, who were alleged to be the only duly constituted directors. A demurrer to this bill was sustained, the court holding that a bill, seeking merely to restrain the directors *de facto* from acting as such, on the sole ground

of the alleged invalidity of their title to their offices, could not be entertained.

We are also referred, by the plaintiffs' counsel, to some cases in our own country, as decisive of the proposition that the court had no jurisdiction to entertain this suit.

The first is *Hodges* v. *New England Screw Co.*, 1 Rhode Island, 312.

This case, the Supreme Court of the United States remarked, in *Dodge* v. *Woolsey*, *ante*, was the best argued and judicially considered case which they knew of on the point, both upon the original hearing and rehearing of that cause.

The opinion of the court was delivered by Chief Justice GREENE, and the conclusion reached, from an examination of all the authorities, was, that a court of equity had no jurisdiction over corporations as such, at the suit of a stockholder, for a violation of charter.

The court also said that the corporation were not the trustees of the stockholders, so far as the corporate property is concerned. A corporation might become a trustee, as an individual might, and, as such, would be subject to the ordinary jurisdiction of the court, in relation to the trust property. But the relation of corporation and stockholders does not imply a trust in the corporation. That the English chancery had exercised a control over charitable institutions in respect to breaches of trust, but the jurisdiction had been cautiously limited to corporations of that character. Such corporations were, clearly, trustees, in respect to the charitable fund, for those who are entitled to the benefit of the charity. But in respect to a mere trading corporation, like the Screw Company, they could not find any precedent, either in England or in this country, for considering the corporate body as the trustees of the stockholders, and, as such, subject to the general jurisdiction of a court of chancery, at the suit of a stockholder.

The cases were then examined, in which, it was assumed, this point had been decided. The first case cited was the *Attorney-General* v. *Utica Ins. Co.*, 2 Johns. Ch. R. 371, in which Chief Justice KENT reviewed the jurisdiction of a court of chan-

14

cery over corporations, and arrived at the conclusion, that in the State of New York all corporations were amenable to the Supreme Court, and to that court only, according to the course of the common law, for non-user or misuser of their franchise; and that the jurisdiction of a court of chancery over corporations was limited to the directors and officers of the corporation, in their character of trustees, for a breach of trust.

The case of *Verplanck* v. *Mercantile Ins. Co.*, 1 Edw. Ch. R. 84, was a bill filed by a stockholder against the company, charging, among other things, that the company had violated their charter, and praying for an injunction to restrain the further operations of the company, and for the appointment of a receiver of all its property and effects, with a view, after payment of debts, to a distribution among stockholders generally, in fact, to dissolve the corporation and wind up its affairs.

The vice-chancellor (McCoun), while he affirmed the jurisdiction of the court over the directors, denied, in the strongest terms, the jurisdiction over the corporation. He held, if the parties stood in the relation of partners to each other, or as *cestui que trust* and trustees, he should have no doubt as to the authority and duty of the court. But that the corporation were not the trustees of the stockholders, nor did the parties stand in the relative situation of partners, and that a court of chancery had no power to interfere with the chartered rights and franchises of a corporation, at common law. On appeal to the chancellor (Walworth), 2 Paige, 438, this view of the common law jurisdiction of a court of chancery, over corporations, for a breach of charter, was sustained. The same view is taken of the power of a court of chancery, at common law, over corporations in the case of the *Attorney-General* v. *Bank of Niagara*, 1 Hopkins, 354; and in the case of the *Attorney-General* v. *Bank of Chenango*, id. 598.

The only English case the court referred to, as an authority for the jurisdiction, was the case of *Solomons* v. *Laing*, decided at the rolls, and reported in the London Jurist for April, 1850.

We have not the case before us, but Ch. J. Greene claimed

that, from its facts, and the prayer of the bill being against the directors of the company, it fell within the settled jurisdiction of a court of chancery.

In the case of the Screw Company, the counsel referred to the clause in its charter making the stockholders individually liable for the debts of the company, and endeavored to support the jurisdiction upon a supposed analogy between such a charter and a case of copartnership, as the defendants do in the case before us.

The court said a copartnership is a contract, and this is the ground of the jurisdiction. A charter is not a contract, except as between the State and the corporation. The powers and rights and duties of the corporation and of the stockholders, are defined by charters, and the individual liability of the stockholders, is the result of the statute and not contract. And this is the view taken of this subject in the case of *Verplanck*, in 1 Edwards, 84.

The court say, if this analogy were to hold, so far as to confer jurisdiction, then this court would be bound to entertain suits generally, between the stockholders and the corporation, in respect to the corporate business and property, and its management, and the corporate franchises, and a breach thereof, a jurisdiction wholly unknown both in England and in this country.

At a subsequent term, the plaintiffs petitioned for a rehearing, because, as they insisted, the decision was erroneous in this, that courts of equity have no jurisdiction over corporations, as such, at the suit of a stockholder, for a violation of charter; whereas courts of equity have such jurisdiction in certain cases, and in the case at bar.

The court reviewed the decision, as the question was new and important, and referred to some English decisions, chiefly in railway cases, not before attainable, and to two American cases, the titles of which are not given. The court then say: We have thought it our duty to review, in this general form, this new and unsettled jurisdiction, and to say, in view of the novelty and importance of the subject, and the additional

light which has been thrown upon it since the trial, we consider the jurisdiction of this court, over corporations for breaches of charter, at the suit of stockholders, and how far it shall be extended and subject to what limits, as still an open question in this court. 3 id. 18.

The plaintiff's counsel refers to another case in 1 Strobhart's Eq. R., 202 (S. C.), the *Vestry and Wardens* v. *Barksdale.* The bill in this case charged the vestry and wardens of an incorporated church, with the design and present practice of perverting their trust by applying the funds of the parish church to the support of the minister of a new village church. The vestry admitted they had, and intended to continue so to apply them. The court said it was quite clear that this court has no authority to interfere with, or control the discretion of the vestry and wardens, unless they transgress the limits of their charter. However unwisely they may exercise the power, they are responsible only to their constituents, in whose hands a complete remedy exists through the quiet operation of the ballot-box.

These are all the cases to which we have been referred on the question of jurisdiction. The case of *Dodge* v. *Woolsey* was decided by a divided court, Justice CAMPBELL delivering an able dissenting opinion, in which Justices DANIEL and CATRON concurred. We confess we are strongly inclined against the jurisdiction, but if otherwise, we think the case made by this bill is not such an one as to warrant its exercise if possessed, and for the following reasons, among others which might be given:

By the second section of the act of February 10, 1849, on filing the certificate, the persons signing and acknowledging it, and their successors, become a body politic and corporate in fact and in name, by the name stated in the certificate, and by that name they had succession, and were capable of suing and being sued in any court in this State; were authorized to have a common seal, and to alter it at pleasure, and by their corporate name were capable of purchasing, holding and conveying real and personal estate. They were a corporation to the same extent for the purposes of their association, as a municipal, or

banking or other corporation, and the same rights and immunities and privileges belonged to them as are accorded to other corporations.

By section three, the management of the concerns of the company was confided to not less than three, nor more than nine trustees, to be annually elected by the stockholders at such time and place, as should be determined by their by-laws.

The charge in the bill, that no election was held on the first Monday of November, 1857, as the by-laws required, amounts to nothing, inasmuch as the fourth section of the act provides that by such an occurrence, the company for that reason shall not be dissolved, but it is made lawful on any other day to hold an election in the manner provided by the by-laws, and all acts of the trustees are declared valid and binding as against the company until their successors shall be elected.

Nor did the fact that the company failed to keep in their office an alphabetical list of their stockholders, showing their residence, number of shares and amount of stock paid in, tend to work a forfeiture of the charter, for by the section requiring it (section twenty-four) the neglect was visited by a pecuniary forfeiture only, of fifty dollars. Nor is the fact that the company made no publication, in the form of a report, in some newspaper, showing the amount of capital, the proportion paid in, and amount of existing debts, to be visited by a forfeiture, because, by the twelfth section of the act requiring it, a failure to do so is made to fall on the trustees individually, and they are made jointly and severally liable for all the debts of the company then existing, and for all that might be contracted before such report should be made. Nor did the fact that one-half of the capital stock was not paid in within one year of the organization of the company, affect, in any way, the exercise of the corporate functions, the stockholders, by the tenth section of the act, being made, severally, individually liable to the creditors to an amount equal to the amount of stock held by them respectively, for all debts and contracts made by the company, until the whole amount of capital stock should be

paid in and a certificate thereof filed with, and recorded by, the county clerk.

The fact that the whole of the capital stock was not paid in in two years from the incorporation of the company, worked, under the same section, a dissolution of the corporation; but how was it to be dissolved? Could it be by the act of one stockholder, or must it not be by the powers granting the charter?

Eminent law writers on this subject say that a cause of forfeiture cannot be taken advantage of, or enforced against a corporation, collaterally or incidentally, or in any other mode than by a direct proceeding for that purpose against the corporation, so that it may have an opportunity to answer. And the government creating the corporation, can *alone* institute such a proceeding; since it may waive a broken condition of a compact made with it, as well as an individual. Angel & Ames on Cor. 746.

It is held, when the terms of a charter are that the corporation shall be dissolved on non-performance of a condition, the mere failure to perform is not, *ipso facto*, a dissolution, but judicial proceedings, and a judgment of *ouster* must be had, in order to effect a dissolution. Ib. 748, and the cases there cited in notes. A court of chancery can be specially empowered by statute, as in the State of New York, to divest a corporation of its corporate character and capacity; otherwise, in all cases, the mode of proceeding to enforce a dissolution, for cause of forfeiture, is by *scire facias*, or an information in the nature of a *quo warranto*, in a court of law.

In the case of the *King* v. *Passmore*, 3 Term Rep. 132, Mr. Justice Ashurst said, a *scire facias* is proper where there is a legal existing body, capable of acting, but who have been guilty of an abuse of the power intrusted to them; and a *quo warranto* is necessary where there is a body corporate *de facto*, who take upon themselves to act as a body corporate, but from some defect in their constitution they cannot legally exercise the power they affect to use.

In this case there was a body corporate *de facto*. They had been doing business more than a year under their charter, had an office in the city of Chicago, had all the necessary officers through whom their business was transacted, and much money and important interests were involved in their undertaking.

The charter of the Bank of Illinois provided that a suspension of specie payments should work a forfeiture. In an action of debt brought on a note executed to the corporation, the defendant, by plea, raised the question of forfeiture, and this court said such a defense could not be made to the action; the proper manner of trying the question of forfeiture, because of the suspension or refusal of specie payment, was by writ of *quo warranto*. *Hilmans* v. *Bank of Illinois*, 1 Gilm. 671.

These views answer the allegation in the bill, that the company had never been legally organized as a corporation, and had never existed as such; this could be ascertained in no other way than by a direct proceeding at law, and furnish no ground for the interposition of a court of equity. It, however, furnished the complainant an opportunity to allege that, since it was not a legally organized corporation, it was a general copartnership.

We are of opinion that the organization constituted the company a corporation, and nothing less, and though possessing, perhaps, some of the attributes of a copartnership, one-half of the capital stock not having been paid in one year after the organization, thereby, by virtue of the tenth section of the act, making the members, severally, individually liable to the amount of their stock for all the debts; in no other sense were they partners.

In the Screw Company case, a supposed analogy was insisted on between such a charter and a case of copartnership, and it was not admitted by the court, as will be seen in our previous notice of this case.

As to the allegation that the stockholders refused to help the company, or advance means to relieve it from its embarrassments, but a partial and feeble effort appears to have been

made to raise means in any way. The trustees did pass an order to assess ten per cent. on the stock on the 13th June, 1857, payable in ten days, and that no one of them responded to the call.

We apprehend this furnishes no ground for interfering with the corporate property, since it was* in the power of the trustees to sell out the stock of the delinquent holders, which, had it been threatened by them, might have induced the proprietors to raise the money to save their stock. The time at which the assessment was directed to be levied was in the midst of great financial difficulties, enveloping all pursuits over the whole Union, and producing great losses. A little temporizing, by which the summer sales of ice, of which they had many thousand tons on hand, might have been realized, and would have gone far to have relieved the company of its embarrassments. There was but one small debt of about $400 then in judgment, and no suit pending of any kind against them.

The order levying the assessment of ten per cent. was passed at a time when business in large cities is usually suspended, and business men absent, as was the case with a majority of the trustees of this company, and scarcely time enough allowed, by its terms, in a tight money market, in which to raise the amount. Seven days had not elapsed, after the ten days had expired, before this bill in chancery was filed, and before the tenth day of July, the whole property of the corporation, and its franchises, had been swept from them; the property sold for a small sum to a rival and insolvent concern, and a solemn decree passed that the Crystal Lake Ice Company was a myth!

We see no sufficient cause for such extraordinary proceedings, nor for the precipitancy by which the final result was reached, except on one hypothesis. It seems that the secretary and treasurer of the company was A. C. Coventry, a lawyer by profession, and its counselor and adviser. He was, too, the largest single creditor of the company, having claims against it exceeding three thousand dollars. He was the adviser, also, of the complainant, Baker, whom the defendant

in error represents, and drew the bill in the cause. He was, without having disclosed these facts to the court, appointed the receiver of all the property of the company, and without trying the market with it, by an offering at public sale, he privately sold it, one day after he was appointed, and had his claim against the company fully paid out of the proceeds. Does not this account for these hasty and unusual proceedings? It is in proof, by Page, one of the trustees, that but a day or two before the 25th of June, he had a conversation with Coventry about the financial affairs of the company, and stated to him, that if the assessment, levied at the meeting of the 15th of June, was not met, that the largest stockholders would expect to raise the amount, to pay off the immediate and pressing claims, and informed Coventry that he was about to leave Janesville, his place of residence, for the north part of Wisconsin, to be absent on business about two weeks; that he returned to Chicago as soon as he could, and did not know of the sale to Joy and Frisbie, until after they had taken actual possession of the property; that immediately on his return, he saw Coventry about the sale and expressed his dissatisfaction with it; that Coventry represented to him, that the company was a mere partnership, and had no corporate powers; that all its members were mere copartners; and all individually liable for its debts; and that there would be about four or five thousand dollars left, after paying all debts, and if he, Page, would keep quiet, and not contest the sale, he would "make it all right" with him; that he believed the statements of Coventry, as to want of corporate powers, and that the company was a mere partnership, and, for that reason, did not proceed, as a trustee, to take legal steps to set aside the sale; that such belief prevailed with him and the other trustees for some time, induced, in great part, by these statements of Coventry, until, upon taking advice from other persons, they learned it was, in fact, a corporation; that about this time a suit was pending in the circuit court for one year's service for the company, brought by E. C. Tarbell against him, and other stockholders; and it was concluded to

make that a test suit, as to whether it was a corporation or not; that it was tried, taken to the supreme court, and decided that it was a corporation; that any delay in the matter, after he was correctly informed of the rights of the corporation, had been only that attending all contested cases; that the belief that the corporation was a mere copartnership, had a tendency to reduce the value of the franchises of the corporation, the business it was carrying on, and its property, and to induce all the small stockholders to give up their interests, as not worth looking after. He further deposed that the company then owned eight two horse teams, worth, with the wagons and harness, five hundred dollars each; some machinery that cost twenty-five hundred dollars and worth that; about forty thousand tons of ice, stored at Crystal Lake, selling in Chicago for twenty-five cents per hundred weight, and costing one dollar and twenty-five cents a ton to bring it in on the railroad.

This statement of quantities and value of property is not sustained by the testimony of James P. Smith, who states that there was not, all together, at Crystal Lake, to exceed nine thousand tons of ice purchased by Joy & Frisbie, and it was badly secured, and they did not realize much from it; that the machinery was not worth over two hundred and eighty dollars, and the horses not worth over seventy-five dollars each; that the business could not be carried on with success, and that Joy & Frisbie paid more for the property than it was worth. These are matters of opinion at most, and what opportunity Smith had to get this knowledge, we are not informed.

Taking the estimate of Smith, as to the quantity of ice, and its value at Chicago, and cost of transportation there, as given by Page, and allowing fifty per cent. for wastage and expenses of selling, it would have realized a sum greatly exceeding that which the receiver obtained for the entire concern, railway track and all.

By what authority can the receiver assert, as he does, that it was useless to offer this property in the public market, and that he had no other resource than the one he adopted, and that

was, to turn the property over to a rival concern, for a small per centage of its real value.

But, whether the concern was profitable or not, the company had rights which, we cannot but think, have been wantonly sacrificed by these unusually hasty proceedings. It is quite probable the opinion expressed by Coventry, that the company had no corporate rights, but was a mere copartnership, contributed no little to the embarrassments of the company, and prevented them from raising money on mortgage, by which they might have carried on the business successfully. There can be no doubt that the hurried manner, and more than railway speed, by which these proceedings were conducted, and the sale had, added to the suspicion cast upon its claim to corporate power, was one great cause of the little value placed upon the property. There were no pressing claims against the company when this hurried sale was made, for it appears the receiver gave a credit of one year for one-fourth of the price for which it sold, and nineteen months for another fourth, whilst the other half was payable in monthly installments of one thousand dollars each; and, out of this, he engaged to complete a barn and fence then in process of erection, requiring a considerable outlay.

It is vain to say there was any pressing necessity for the sale of this property.

There was no necessity to appoint a receiver, because no fraud is alleged or shown, and no sufficient proof that such a step was necessary to save the property from material injury, or rescue it from impending destruction. And there was a fatal objection to the person appointed receiver. He was not disinterested; he was the legal adviser of the complainant and framed the bill; he was the legal adviser of the company; he was the largest single creditor; all these disqualified him, and he should not have been appointed. Edw. on Rec. 4. He was not appointed at the proper time. A receiver is not usually appointed unless fraud is clearly proved by affidavit, or when it is shown that imminent danger would ensue, if the property is not taken under the care of the court, before an

answer is put in. There must be a strong special ground to induce the court to interfere in this way before an answer. (Id. 10; referring to *Middleton* v. *Dodswell*, 13 Vesey, 266; *Bloodgood* v. *Clark*, 4 Paige's Ch., 574); when a default is entered, the rule would doubtless be to require affidavit, before the property shall be taken out of the custody of its true owners.

In every view in which we can regard these cases, we are compelled to say that in the first, the company not having been made a party, the decree depriving them of their property and franchises was void and of no effect, and the decree must be reversed and the bill dismissed.

In the other case, wherein the Crystal Lake Ice Company is a party, and their franchises taken from them, the court erred in so decreeing, and had no jurisdiction so to decree, and that decree must be reversed and the bill dismissed.

*Decree reversed.*