*(Circuit Court of Champaign County.   In Chancery.)*

### Samuel H. Meloy

vs.

### The Wabash Railway Company, et al.

(March, 1879.)

1. RECEIVERS—APPOINTMENT OF FOR RAILROAD COMPANY AT INSTANCE OF BONDHOLDERS. The court will not appoint a receiver of a large railroad system at the suit of a bondholder where there is no allegation of fraud or insolvency, and it is merely alleged that the railroad company has failed and refused to apply its revenues to the payment of interest on its bonds.

2. SAME—WHEN COURT SHOULD APPOINT. In the appointment of a receiver the court always exercises its extraordinary powers. The remedy is harsh and summary in the extreme and should not be applied except in cases of extreme necessity. No ordinary occasion should justify its use.

3. SAME—NOT APPOINTED UNLESS FRAUD SHOWN OR IMMINENT DANGER TO PROPERTY WOULD ENSUE. A receiver is not usually appointed unless fraud is clearly shown or imminent danger would ensue if a receiver is not appointed. There must be an imperative necessity for the step.

4. SAME—IN CASE OF RAILROAD CORPORATION. Courts are more reluctant to lend their extraordinary aid by the appointment of receivers over railways than in any other class of cases.

5. REMEDIES OF BONDHOLDERS UPON FAILURE OF MORTGAGOR TO PAY INTEREST. If the mortgagor in a railway mortgage securing an issue of bonds fails to pay the interest on the same, the remedy of the bondholders is to foreclose the mortgage or to sue

in a court of law, and not to apply for the appointment of a receiver.

6. APPOINTMENT OF RECEIVERS—WHAT CONSIDERATIONS SHOULD INFLUENCE COURT. In an application for the appointment of a receiver of a railroad at the suit of a bondholder, the fact that such appointment would affect the market value of the bonds and seriously affect the operation of the road should be taken into consideration by the court.

Bill for foreclosure of a mortgage and the appointment of a receiver. Heard before Judge C. B. Smith. Decided March, 1879. The facts are stated in the opinion.

*Hassler & McWilliams,* for complainant.

*Gen. Wager Swayne* of Toledo, Ohio, *& H. S. Green,* for defendants.

SMITH, J.:—

This suit is brought by the complainant, a resident of the District of Columbia, to enforce the payment to him of bonds amounting to the sum of ten thousand dollars, which he avers it is the duty of the Wabash ailway Company to pay, and it further avers that the Wabash Railway Company, has not nor any one for it, paid the Company's bonds nor any interest thereon, since November 1, 1874, and that said Company is now denying its liability for either principal or interest upon said bonds owned by complainant. And the bill sets out with great care and elaboration the organization and history of the various railroad corporations which ultimately terminated in one consolidated, continuous line of road extending across three states, from the city of Toledo, in Ohio, to the Mississippi river in Illinois, making in all over six hundred miles of continuous railway, and now known as the "Wabash Railway Company;" and it is alleged in the bill, and admitted by defendants, that in 1862 the Toledo and Wabash Railroad Company, for the purpose of enabling it to meet the demands made upon it for transportation, issued six hundred thousand dollars of bonds, known as "Equipment Bonds," and placed them upon the market without any security beyond the maker's promise to pay thereon. These bonds

are made payable in 1883, with seven per cent. interest, payable semi annually.

It is averred that in February, 1867, the Toledo, Wabash and Western Railway Company resolved to, and did issue its bonds to the extent of fifteen millions of dollars, to be known as its consolidated bonds, and at the same time made and recorded a mortgage on all its property securing the payment of these new bonds when they should be issued. The object of this action on the part of the company seems to have been to take up the various outstanding obligations against the small section of road composing the new consolidated company and fund them and issue new bonds, to take their place as fast as the owners of the old bonds would come forward and surrender them. The right to fund the old bonds, of course, was optional with the holders. It appears, from one of the exhibits shown by the defendant, that 96.5 of all the outstanding indebtedness has been funded under this scheme. The exhibit shows that none of these equipment bonds have been funded, and it is averred in the bill that the holders of the equipment bonds have not been invited to fund their bonds and thus share the benefit of the consolidated mortgage bonds. It is alleged that the present corporation, the Wabash Railway Company, came into possession of all the property rights and franchises of the Toledo, Wabash and Western Railway Company, by purchase at a judicial sale, and that it holds the property subject to the rights of the consolidated bond-holders, and of those who hold the equipment bonds. The respondents deny that they hold the property subject to any supposed rights of the owners of the equipment bonds, among whom is the complainant in this suit. The complainant charges that the defendant is neglecting and refusing to apply all its net revenues to the payment of the interest accruing on the bonds secured by the consolidated mortgage and especially to that class of bonds known as the equipment bonds, and charges that the defendant is applying a part of its resources to the payment of the Seney mortgage, which it alleges to be junior to the complainant's bonds. The bill prays for an account and that the bonds held by complainant

may be declared a lien on the property of the defendant, and the defendant required to pay the same; that the said mortgage be foreclosed, and that pending proceedings for foreclosure, a receiver for the property of the defendant be appointed.

The respondent denies that the complainant's bonds are secured by the consolidated mortgage, and denies any liability to him whatever, and resists the appointment of a receiver, and the propriety of granting or refusing the prayer of this bill is the only question upon which I am now called to pass, and in doing so I shall assume for the purpose of this motion, that the complainant's bonds are secured by the consolidated mortgage, and that the Wabash Railway Company holds and owns its roads and franchises subject to the superior lien of the complainant, as he claims in his bill. In other words, upon his own showing, is he entitled to the appointment of a receiver? In the appointment of a receiver the court always exercises its extraordinary powers. The remedy is harsh and summary in the extreme. The court before ascertaining the right or to whom the property in controversy belongs, upon substantially ex parte proceedings (for they can be but little better when even both parties are before the court) lays a strong hand upon him who is in possession of the property and compels him to surrender it to the possession of a stranger and engage in long and vexaatious litigation for its recovery. This sword of justice with which courts are armed, ought to be sheathed except in cases of extreme necessity. No ordinary occasion should justify its use. In *Baker v. The Administrator of Backus*, 32 Ill. 79, 115, the supreme court say that: ''A receiver is not usually appointed unless fraud is clearly proved by affidavit, or when it is shown that imminent danger would ensue, if the property is not taken under the care of the court, before an answer is put in. There must be a strong special ground to induce the court to interfere in this way before an answer.''

And in *First National Bank of Sioux City v. Gage*, 79 Ill. 207, 209, the court say that: ''A receiver should be appointed in no case, unless it is made to appear there is an imperative

necessity for the step; to preserve some particular property' for such parties as shall be entitled to the benefit.''

In High on Receivers, at section 365, it is said that: ''While the jurisdiction of equity over railway corporations, as enlarged by the statutes and practice of the various states, is based upon and exercised in accordance with substantially the same principles which govern its jurisdiction over other corporations, the courts are more reluctant to lend their extraordinary aid by the appointment of receivers over railways than over other corporate bodies. The importance of these corporations, as being *quasi* public bodies, and the peculiar nature of their property and franchises, sufficiently explain the reluctance with which equity interferes with their management, and in general the courts proceed with extreme caution in placing them in the hands of receivers and whenever the ordinary remedies provided by law are open to the creditors of such corporations for the enforcement of their demands, the appointment and continuance of a receiver in office for a long period of years is the exercise of a judicial power which can only be justified by the pressure of an absolute necessity.''

These are sound and wholesome doctrines of the law, and are but examples of the language of all the books, and it seems to me to be a matter of regret that the courts have not been always as careful, and more especially in recent times, to keep within the prescribed limits of this extraordinary jurisdiction as would seem to have been required by private and public rights. It is a matter of public notoriety that millions of dollars of property have been wasted and squandered in the state of Illinois alone, and men delayed and hindered in the assertion of the plainest rights, by the free use of this arbitrary and monstrous power. The great railway interests of this state have been seriously crippled by having their earnings eaten up and squandered by being run by receivers and courts instead of by the owners. Railroads, like individuals, should be compelled by law, if need be, to keep strictly and faithfully all their legal obligations both to private individuals and to the public. Railroad corporations, like individ-

uals, must render a willing obedience to the majesty of the
law and submit to its mandates, and like individuals they may
appeal to the laws for protection when their just rights are
invaded. But if this corporation for any reason, good or
bad, fails to meet its legal obligations and to pay all its debts
promptly, why should it have all its property taken away
from it before judgment and turned over to the hands of a
stranger? If it shall be sufficient cause for the appointment
of a receiver that it cannot pay its debts, then by the same
reasoning might the holders of mortgages and trust deeds ask
to have the farms and houses in Illinois turned over to them
until they are paid.

The complainant argues here with a great deal of force and
justice, that the majority have no right to deprive the minor-
ity of their right of collecting their debt, however small that
debt may be compared with the vast volume of the property
of this corporation. While this is true, the majority have a
right to say to him when he comes into a court of equity for
relief, that he shall not be permitted to pursue a course that
would involve common ruin to all and waste infinitely more
than he can save. If this complainant has any valid and
subsisting claim against any of these defendants, either of a
legal or equitable character, that claim can be asserted by the
ordinary and usual mode of collecting debts.

If these bonds are secured by this mortgage, I can per-
ceive no reason why the mortgage cannot be foreclosed in the
usual manner, and if the defendants fail to pay what is found
due against them, the court will order their property sold
and compel them to pay. If the demand is simply a legal
one, then a judgment at law can be had and they may take
on execution, if the defendant has any property. But what
is the court here asked to do? It is conceded on the argu-
ment that the value of the property and franchises of these
defendants amounts to more than twenty millions of dol-
lars; that it is a great public highway traversing and crossing
three states of this union, giving constant employment to a
great multitude of people and carrying a vast commerce and
thousands of people securely and safely on its flying trains

every day and night. It is in proof that under its present wise and prudent management its securities and obligations are steadily rising in value year after year and no effort is made to show that this steady increase in its value is the result of stock-jobbing or gambling. And yet the court is asked to reach out and lay its hands on this vast enterprise and practically paralyze and put a stop to all that has been realized within the past two or three years and turn the management over to stranger hands, who could at best but imperfectly operate it, and all for the purpose of enabling the complainant to collect his debt of ten thousand dollars by this extraordinary method. The language of the supreme court of the United States in the case of *Railroad Company v. Soutter,* 2 Wall. 510, 523, is so pertinent here that I cannot do any better than to quote it: "The idea of appointing or continuing a receiver for the purpose of taking ninety-five miles of railroad from its lawful owners, which is earning a gross revenue of $800,000 per annum to enforce the payment of a judgment of $16,000, the lien of which is seriously controverted, is so repugnant to all our ideas of judicial proceedings that we cannot argue the question. If Mr. Howard has a valid judgment, the usual modes of enforcing that judgment are open to him, both at law and in chancery; but the extraordinary proceeding of taking millions of dollars' worth of property—of such peculiar character as railroad property —from its rightful possessors as one of the usual means of collecting such a comparatively small debt, can find no countenance in this court."

Such is the language of the highest court in the country, when an effort was made to take from the rightful owner only ninety-five miles of railroad to compel them to pay a judgment of $16,000. But here I am asked to take from this defendant a railroad over six hundred miles long, worth at least twenty millions of dollars and put it into the hands of a stranger to enable the complainant to collect ten thousand dollars of bonds and that upon a controverted claim, and that too upon a bill where no single allegation of fraud appears and where it does affirmatively appear that this defendant

has a lawful and just existence through a regular judicial proceeding and for which its present owners paid a very large sum of money. I am asked here to go to the very extreme of judicial power and to pass far beyond the ordinary boundaries which have hitherto circumscribed judicial discretion. The consequences of such judicial madness to the thousands of people who own the bonds of this great corporation would be most deplorable. Who can doubt, if a receiver for this company was appointed here this morning, that its bonds would not be depreciated ten per cent. in Wall street before sundown, thereby causing vastly more injury and loss to the holders of the company's obligations than would be saved to this complainant? Who can doubt, if I appointed a receiver that the running arrangements of the road must be seriously impaired and interrupted to the great detriment of public and private interests? These are considerations to which the court cannot be blind and must not disregard in the exercise of that sound judicial discretion which ought to control the deliberations of the court.

In arriving at this conclusion, I do not deny the complainant the full and complete right which he enjoys to proceed with his bill in the ordinary and usual mode provided by the law for every citizen to enforce payment of his just debts against his debtors, but on the contrary, to prevent the gravest and most serious consequences to a multitude of people who are interested in saving this great railway company and its property from becoming again the helpless victim of railroad wreckers.

The appointment of a receiver and the prayer for the injunction will be denied. Solicitors for respondents may prepare an order to be signed to that effect.