190   283
115a  ⁵588

EDWARD H. NEVITT *et al.*

*v.*

CHARLES H. WOODBURN *et al.*

*Opinion filed April 18, 1901—Rehearing denied June 5, 1901.*

1. WILLS—*limitation over held to violate the rule against perpetuities.* Where a testator bequeaths a trust fund to his son for life with remainder to his children, and at their death, if childless, to go to collateral heirs of the testator, the limitation over to the collaterals is void, under the rule against perpetuities, where, at the testator's death, two children of his sons were in being but no children had been born to them; but the holding of such limitation over to be void does not affect the validity of the gift to the children of the testator's son, and the absolute interest in the fund vests in them subject to their father's life estate and the provisions of the will respecting the purpose of the trust, and to the rights of after-born brothers or sisters, if any, to be let in.

2. TRUSTS—*when a trustee does not have immunities of a receiver with respect to suits.* Where a receiver is appointed to take possession of a trust fund created by will, to preserve it pending suit to remove the trustee, the successor in trust appointed by the court to execute the trust cannot be regarded as a receiver, so as to exempt him from suit, except by consent of the court, although he is re-

quired to perform certain duties which had devolved upon the receiver prior to the appointment of the new trustee.

3. SAME—*when decrees approving acts of trustee do not bind owners of fund.* A trustee cannot bind owners of the trust fund by decrees of the court approving his acts in depleting the fund without having made them parties to the suit, wherein such decrees could properly be entered.

4. SAME—*when trustee should be removed and required to account.* If a trustee has been derelict in his duty, has failed to keep proper books of account, and has without sufficient warrant depleted the trust fund, he should be removed and required to account, and to restore to the fund the amount by which he improperly depleted it.

5. SAME—*trustee entitled to credit for attorney's fees paid to protect fund.* Upon an accounting against a trustee he is entitled to credit for attorney's fees and court costs properly expended by him for the defense and preservation of the trust fund.

*Nevitt* v. *Woodburn*, 82 Ill. App. 649, reversed.

APPEAL from the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Whiteside county; the Hon. JOHN C. GARVER, Judge, presiding.

JARVIS DINSMOOR, for appellants.

MORRISON & BETHEA, and C. H. WOODBURN, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

We were asked to review the record in this case at a former term on the appeal of the same appellants, taken directly to this court from the final decree of the circuit court of Whiteside county. We dismissed that appeal for the reason that it should have been taken to the Appellate Court, no freehold being involved. (*Nevitt* v. *Woodburn*, 175 Ill. 376.) The record was then taken to the Appellate Court on a writ of error, and the decree of the circuit court was in part reversed and the cause was remanded, with directions to enter a modified decree in conformity with the views expressed in the opinion of

the Appellate Court. (82 Ill. App. 649.) For a statement of the case reference is made to the opinion in 175 Ill. 376. Further facts showing a history of the litigation are stated in *Woodburn* v. *Woodburn*, 123 Ill. 608.

The bill was filed by May McD. and Beatrice L. Woodburn, infants and only children of George W. Woodburn, Jr., deceased, by Charles H. Woodburn as their next friend, also by Charles H. Woodburn in his own right, (the said George W. Woodburn, Jr., and Charles H. Woodburn were the only children of James H. Woodburn,) against said Edward H. Nevitt, James and Jarvis Dinsmoor, James H. Woodburn and Phebe A. Woodburn, for the removal of said Nevitt as trustee under the will of George W. Woodburn, Sr., deceased, and to compel an accounting and a restoration of the trust fund created by said will, in which the complainants claimed an interest. On the final hearing in the circuit court the bill was sustained and a decree entered, as set forth in the former cause, in favor of the complainants. From the judgment of the Appellate Court the defendants to the bill, Nevitt, and James and Jarvis Dinsmoor, prayed and obtained this appeal to this court.

The provisions of the will of George W. Woodburn, Sr., which created the fund in controversy and provided for its disposition, are as follows:

"I hereby will, direct and request, and by this my last will do place in the hands of my executor all my real estate, being the farm upon which I live, and do direct him to sell what may be necessary for the payment of my debts; also to sell an amount sufficient to raise a fund sufficient to pay of interest to my beloved wife, Phebe Ann Woodburn, $1000 per year, which amount shall be for her support during her lifetime, and at her death this fund shall go to my legal heirs in the order below mentioned,—that is, to my son, James H. Woodburn, if living, for his use during his lifetime, at his death to go to his children, and at their death, if childless, to go to and

be divided among the families of my brother, William H. Woodburn, John M. Woodburn and Jane E. Ege. One condition herein is, that my son, James H. Woodburn, may be a bidder, and if he should buy the real estate so sold by my executor to create the aforesaid fund and properly-secure the same by undoubted securities to be made to my executor, then I will, request and direct that the balance of my property so remaining shall be the bequeath I leave to my son, James H. Woodburn, in fee simple. It is my will that the said Phebe Ann Woodburn shall be fully protected in all her rights as given and directed in this will, and I charge my executor to see that my will is fully carried out, and direct him to defend her in all suits at law that may arise from this property; and should the aforesaid James H. Woodburn, or any person claiming under him, attempt, by law or annoyance, to deprive her of any of the right in this my last will, then I direct that he or they shall forfeit all rights, gifts or bequeaths that he or they may acquire under this will, and the said property so willed to him or them shall descend to my brother William H. Woodburn, John M. Woodburn and Jane E. Ege, families or heirs. I hereby direct and will that until my executor can carry out my directions as in this will made, that my beloved wife, Phebe Ann Woodburn, shall remain in my house upon my farm, and shall receive for her support the proceeds of the farm after necessary expenses are paid; and should any person or persons, by law or otherwise, attempt to deprive her of this right, the said persons shall forfeit and be deprived of any or all property given them in this will, and the property so willed to them shall descend as above directed. * * * I do hereby appoint and constitute my trusty friend and nephew, Peter Ege, to execute this my last will and testament."

The said James H. Woodburn was the only child of the testator. The said James had only two children, and they were living at the time of the testator's death, viz.,

George W. Woodburn, Jr., the father of the two infant complainants, and Charles H. Woodburn, the other complainant. When this suit was commenced the said George was dead, and the two infant complainants were his only children and heirs.

The complainants' suit was based upon the claim that they were the beneficial owners of the fund, subject, first, to the annuity for life of Phebe A. Woodburn, the widow of the testator; and second, to the life interest of James H. Woodburn. The contention is made by appellants that the complainants in the bill had no interest in the subject matter of the suit,—no interest in the fund in controversy,—and therefore their bill should have been dismissed. The point made is, that the limitations over, under which appellees claim, are void for remoteness; that they violate the rule against perpetuities because the subject matter of the gift,—that is, the fund in controversy,—may, under the terms of the will, be taken out of commerce for a period longer than a life or lives in being and twenty-one years thereafter. We are of the opinion that the view taken of this question by the Appellate Court is the correct one, and that under the rule against perpetuities, the limitation over, prescribed by the first clause of the will, to collaterals in case the grandchildren of the testator should die childless, is void, for, while the complainant Charles H. Woodburn, and his brother, George W., were living at the time of the testator's death, the two infant complainants, children of said George W., were not *in esse*, and it is clear that it could not be known at the time the testator died and the will took effect whether or not the estate would vest in such collaterals at all, much less within the period limited by the rule. Such limitation being void under the rule against perpetuities, the absolute interest in the fund vested in the children of James H. Woodburn at the testator's death, subject to the life interest of said James and the trust in favor of Phebe A. Woodburn. Of course,

as said James might have other children besides his two sons, Charles H. and George W., Jr., the latter took subject to the right of after-born children, if any, to be let in to share equally in the estate. This possibility still exists, but it did not and does not prevent the vesting of the remainder, if it may be so called, in the children of James H. Woodburn who were living at the time of the death of the testator,—that is, in Charles H. and George W. Woodburn, Jr. The latter having since died intestate, his two heirs, the infant complainants, have become the beneficial owners of his share and are proper parties complainant in a bill to protect the trust fund. .

It is urged that the interests of the complainants are contingent, because the will provides that if James H. Woodburn, or any one claiming under him, should attempt, by law or annoyance, to deprive Phebe A. Woodburn of any right given her by the will, his or their rights and bequests given by the will should be forfeited and should pass to certain collaterals named. We regard this provision as clearly a condition subsequent, and not a condition precedent to the vesting of the estate.

It is also urged that to hold the limitation over to the children of James H. Woodburn valid, is to divide up one entire scheme, and, in effect, to make a new will for the testator, and *Lawrence* v. *Smith*, 163 Ill. 149, is cited to the proposition that the court has no power to do this but must declare the entire provision void. We are of the opinion that there is a marked distinction between the two cases on the question involved. We are unable to see any such connection between the limitation over to the children of James H. Woodburn and the one to the collateral relatives of the testator in case said children should die childless, as to render it necessary that they should stand or fall together. At least it cannot be said that the first one is so connected with or dependent upon the other that the testator would not be presumed to have intended the former without the latter. Nor can it

be seen that any manifest injustice is done by the will when construed as it has been (and, as we think, correctly,) by the Appellate Court. The limitation over to the collaterals, contingent upon the dying of the children of James childless, is void under the rule, leaving the prior limitation unaffected.

But the defense chiefly relied on below and urged upon us as sufficient ground for the reversal of the decree is, that the appellant Nevitt, having been appointed by the court trustee to execute the trust created by the will, was to all intents and purposes a receiver of the court, and that having reported to and acted in pursuance of the orders and directions of the court in the cause wherein he was appointed, his acts as such officer cannot be called in question in any other cause, and that it is a contempt of court to bring suit against a receiver without first having obtained permission of the court and in the cause in which he was appointed. The general doctrine contended for by the appellants as applicable to receivers need not be denied, but we are of the opinion that Nevitt did not occupy the position of receiver, but only that of trustee charged with the duty of executing the trust created by the will and in the manner provided by that instrument. A receiver is a person standing indifferent between the parties, appointed by the court to receive and preserve the property or fund in litigation pending the suit. He is an officer of the court, appointed for a temporary purpose, and has no powers except those conferred on him by the order by which he is appointed, and such as are derived from the established practice of courts of equity. Property in his possession is *in custodia legis*, his possession being that of the court which appointed him. (*Baker* v. *Backus*, 32 Ill. 79; High on Receivers, 2; 20 Am. & Eng. Ency. of Law, 11; *Hooper* v. *Winston*, 24 Ill. 354.) But a trustee may be appointed by will, deed or in other ways, without the order of any court and without a suit pending, and his powers, as a rule, are

190—19

governed by the instrument creating the trust, and not by decree of court. Property in his possession as trustee is not *in custodia legis*, as in the case of receivers or other officers of the law or of the courts, and he may be called to account by any court of equity obtaining jurisdiction. We find nothing in this record to authorize the conclusion that Nevitt was appointed receiver of the fund in contro- versy, in the sense contended for, as an officer of the court, but the record, and especially the order appoint- ing him, shows that he was appointed trustee under the will of George W. Woodburn, deceased, and to execute the trust created by the will. In all of his reports, and in his pleadings in the suits to which he was a party, he describes himself as such trustee, and not otherwise. True, he was appointed trustee by the court in the suit of Phebe A. Woodburn against Peter Ege, (consolidated with other suits,) wherein she sought to compel Ege, the trustee appointed by the will, to account, and also to have him removed; but in appointing him the court merely ex- ercised its undoubted equitable powers over trusts and in the removal and appointment of trustees. Prior to his appointment the court had appointed one Sanborn receiver of the fund without removing Ege as trustee.

It is said, however, that the order appointing Nevitt required him to perform all of the duties that had de- volved upon Sanborn as receiver, and that thereby Nev- itt became receiver,—an officer of the court,—and not merely a trustee under the will, in lieu of Ege. We can not so conclude. In the first place, that part of the order was confined to collections from Ege and the disposition of such collections. The continuation of the receiver- ship, except as to certain matters not then fully settled in the then pending litigation, became unnecessary, ex- cept as to such matters, after the appointment of Nevitt as trustee under the will and his assumption of the duties of the trust, but Sanborn continued to act as receiver for some time after Nevitt was appointed. The duties of

Nevitt, when appointed, were measured, in character and duration, by the trust itself,—not by the orders of court entered in the then pending suit. Receivers may be, and often are, appointed to take possession of the fund from the trustee in order to preserve it pending a suit for the removal of and an accounting by such trustee. In such a case it could not be said, either that the receiver was the trustee or that the trustee was the receiver. Nor could it be said, after the removal of the trustee and the appointment of another and the discharge of the receiver, that the new trustee was a receiver and not liable to be called on to account except by application to the court in the cause in which he was appointed. The practice, in equity, in such cases is too well understood to require citation of adjudicated cases.

While it appears that the consolidated case, in which Phebe A. Woodburn, James H. Woodburn and Peter Ege, trustee, were the principal litigants and in which Nevitt was appointed trustee, was still on the docket of the court, and that Nevitt, as such trustee, made reports to and obtained orders from the court from time to time, and that in pursuance of such orders he paid out of the principal of the trust fund court costs, solicitors' fees and certain of his own charges as trustee, still neither Charles H. Woodburn nor George W. Woodburn, Jr., both of whom were then living and were the ultimate beneficial owners of the fund, was a party to that cause, and consequently they were not, nor were the infant complainants, the heirs of said George, bound by the orders and decrees entered therein. The trustee could not bind the owners of the fund by the decrees of the court approving his acts in depleting the fund without having them made parties to the suit wherein such decrees could properly be entered.

It is urged, however, that these complainants are bound, because, as it is said, their interests were represented by other parties to the cause. It is said that Peter

Ege, the executor and trustee under the will, represented the estate and the complainants, so far as they had any interest, and *American Bible Society* v. *Price*, 115 Ill. 644, is cited in support of this view. But in that case the interest was contingent, while here it was vested. The bill of Mrs. Woodburn appears to have been brought against him as trustee of the fund, to compel him to account as such trustee, and for the interest on the fund which he had failed to pay over to her order, and for his removal as trustee. Ege occupied the dual position of executor and trustee. He might continue to be executor after his removal as trustee. How far he might be held to represent the parties in interest in administering the estate as executor it is not necessary in this case to decide, but very clearly, as defendant to a bill brought by an annuitant or other person interested in the fund, he could not, merely by virtue of his trust position, be held to represent other persons also interested in the fund adversely to him, as he was defendant in that suit, such as the ultimate beneficial owners, as these complainants are. These complainants' interests under that bill, in so far as it sought, by the removal of Ege as trustee, to prevent a release of the securities for the fund and its loss, were antagonistic to Ege, and they could with much more propriety be said to have been represented by the complainant in that suit, Phebe A. Woodburn, than by Ege. The bill made no assault upon the principal of the fund, but sought to recover the annuities due her out of the interest, and to make the same secure by removing Ege. There is no analogy between such a case and a suit against the executor or administrator of an estate by a creditor to recover a demand due him from the decedent. Counsel does not, as we understand the argument, contend in this court that the complainants in this case were represented in the consolidated suit by James H. Woodburn. That question seems to have been raised in the Appellate Court, and was there properly disposed of.

We are of the opinion the court properly found, from
the evidence, that the trustee had been derelict in his
duty, had failed to keep proper books of account, and had
without sufficient warrant depleted the trust fund, and
the court did not err in decreeing that he be removed as
such trustee, and that he should account and restore to
the fund the amount by which it had been improperly di-
minished by him. But we are unable to agree either with
the circuit or the Appellate Court as to the amount with
which Nevitt should be charged, nor as to the amount
of the depletion which should be charged against the
appellants James and Jarvis Dinsmoor. In its order of
reference to the master, and in the second order referring
the cause back to the master, the master was properly
directed, in stating the account, to find and state the
amount necessarily paid out by the trustee from the prin-
cipal of the fund in preserving the same. In stating the
account the master found that the principal of the trust
fund received by the trustee consisted of the promissory
notes of James H. Woodburn secured by mortgages on
the lands purchased from Ege, the former trustee, aggre-
gating $8000; also, $166.93 received from Sanborn, the
receiver, and $1361.86 of interest which Nevitt improp-
erly paid over to Phebe A. Woodburn but which he should
have retained and paid into the principal of the fund, to
cover, *pro tanto*, a depletion of $2180 caused by the reten-
tion of Phebe A. Woodburn of her notes of that amount
belonging to such fund,—making a total charge to Nev-
itt, the trustee, by the master, as constituting such fund,
of $9528.79. The master then found that Nevitt had paid
out court costs and expenses and attorney's fees in the
necessary defense and preservation of the fund, $1244.58,
leaving a balance properly now chargeable to Nevitt of
$8284.21. The master then found that Nevitt had nothing
remaining in his hands belonging to such fund except 64¼
acres of land, bid in at $6945 by him at one of the fore-
closure sales of the lands mortgaged to secure such fund,

or a part of such lands, and that this land so bid in was, at the time of making the report, of the cash value of $9050. The master then credited Nevitt with said land at the price, $6945, for which the same had been so bid in or purchased by him, and deducted that amount from the balance with which he was chargeable, leaving a deficit or depletion of the fund for which Nevitt was liable, of the amount of $1339.21. Exceptions to the master's report were filed by the litigants on both sides, and in the final decree the court, without specifying, sustained all the complainants' exceptions consistent with its decree and overruled all others. By this decree Nevitt is charged with the principal of the notes of James H. Woodburn secured by mortgages, as above stated, aggregating $8000; also $166.93 received from the receiver, Sanborn; also $2180, the amount of the notes of Phebe A. Woodburn belonging to the fund which had been surrendered up to her by Ege, but which it was afterward held (123 Ill. 608) constituted a part of the trust fund and should be returned to the trustee. Nevitt was charged with these notes by the decree, because, on the failure of Phebe A. Woodburn to return them, he did not pay into the principal of the fund the same amount of the interest which he collected for her, but paid to appellants James and Jarvis Dinsmoor, on her order, for her debt to them, the sum of $979.01, and paid out the balance without restoring any part of it to the principal of the fund. The total charged by the court to Nevitt was in this manner fixed at $10,346.93. It was then decreed that he was entitled to be credited only "with the amount of the principal fund yet remaining and secured by the real estate which said Nevitt holds title to, to-wit, the sum of $4753, leaving said Nevitt indebted to the said trust fund in the sum of $5593.93," which last named amount he was adjudged to pay. Phebe A. Woodburn was defaulted, and was also adjudged to pay said amount of the principal of her said notes, $2180, and the appellants James and

Jarvis Dinsmoor the sum of $1693.79, which included the aforesaid sum of $979.01 paid to them by Nevitt for Phebe A. Woodburn, and the balance for professional services rendered for the trustee in the trust estate. It was further decreed that whatever of the said sums should be collected from James and Jarvis Dinsmoor and from Phebe A. Woodburn, or from either of them, should be credited to Nevitt in reduction of said amount of $5593.93 adjudged against him. This decree was affirmed in all respects by the Appellate Court, except that the total amount adjudged against said Nevitt was reduced from $5593.93 to $5540.94, and except as to the direction that Nevitt be credited with the amount which should be collected from James and Jarvis Dinsmoor, that court holding, that while the Dinsmoors were liable to the *cestuis que trustent* for whatever of the trust fund was improperly paid to them, either for services or for the debt of Mrs. Woodburn, with notice that it was moneys belonging to the trust fund and that it could be recovered by the owners of the fund, they were not liable to the trustee.

We are satisfied from the record that Nevitt never received $8000 of the notes of James H. Woodburn, nor the proceeds thereof, which have been charged to him. These notes consisted of two notes for $2000 each, previously reduced by credits to a total of $3247, secured by what is called in the record the "north mortgage," and two other notes, amounting in the aggregate to $4753, secured by the "south mortgage," making a sum total of $8000. One of the notes secured by the "north mortgage" was never received by Nevitt, but had been put in suit in a foreclosure proceeding by Sanborn, as receiver, in which suit Nevitt, by supplemental bill, afterwards, under the order of the court, included the other note secured by the same mortgage, and on the sale by the master Nevitt, as trustee, under the direction of the court, purchased the land, and after receiving the master's deed sold the same for $4155, which was less than the amount

of principal and interest merged in the decree, by $1458.04. This shrinkage in the value of the securities, or loss, was at that time apportioned between the interest fund belonging to the widow and the principal fund belonging to complainants, in proportion to the amount of each invested in the land. The loss to the principal fund, as thus equitably apportioned, was $887.66. There was evidence outside of the records given in evidence that land values had diminished. The sale was a public one, after proper notice and under the order of the court, and we find nothing in the record tending to prove any misconduct on the part of the trustee, nor any sufficient cause to charge him in this case with the amount of such loss. We are therefore of the opinion that he should have been charged with the difference between the amount of such loss and the $8000 in said notes of James H. Woodburn, —that is, $7112.34. The complainant Charles H. Woodburn had full knowledge of these proceedings and became interested in the land at the time, which was many years before he began this suit against the trustee, and it does not appear that he then objected to the purchase or the sale by the trustee. Every one can see more clearly the unwisdom of past transactions than of present ones.

Charging the trustee, Nevitt, with $7112.34, the proceeds of the principal of the Woodburn notes secured by "the north" and "the south" mortgages, and the $2180 received by him for the principal of the notes of Mrs. Woodburn belonging to the fund and which he should have placed with said fund as a part of it, and the $166.93 which he received from the receiver, Sanborn, (which was all that remained in Sanborn's hands as the proceeds of the "Odenthal mortgage," so called in the record,) the total amount of the principal fund coming into the hands of Nevitt was $9459.27. With this fund the receiver apparently became burdened with litigation which involved its safety and security, to a greater or less extent, and such

litigation, in one form or another, has continued ever since,—a period of nearly twenty years. Soon after it began, and before the appointment of Nevitt, James H. Woodburn stopped paying interest on his notes, which constituted the greater part of the trust fund, and foreclosure suits became necessary to collect the interest. It was Nevitt's duty, under his trust and by the will, to collect such interest and to pay it over to the widow. Besides, he took no action in the litigation, by bringing foreclosure suits or otherwise, without the order of the court which appointed him, as we understand the record. Appellees say, that, not having been parties, they are not concluded by such orders, and that they were not admissible in evidence as against them. Complainants are certainly not concluded by them, but we are of the opinion that the records given in evidence were properly received to show how Nevitt dealt with the property in his hands as trustee, and how the depletion or diminution of which they complain happened, and also as bearing upon the question whether the loss was caused by his fault or mismanagement or by circumstances over which he had no control. Nevitt would clearly have been chargeable with a neglect of duty had he failed to take the necessary steps to collect the interest, or had allowed these notes to remain unpaid and thus to become barred by the Statute of Limitations, or the amount of interest to so accumulate as to render the mortgage insufficient security for the principal and interest of the debt. Even as it turned out, there was a loss of a part of the principal and interest of the notes secured by the "north mortgage." It seems almost a self-evident proposition that the foreclosure suits at least were properly, if not necessarily, brought for the preservation of the trust fund.

The master found, and reported to the court, that Nevitt had paid out in court costs and expenses and attorney's and solicitor's fees the amount of $1244.58, which was properly expended for the defense and preservation

of the principal of the trust fund, and of this amount
$699.50 was paid for professional services in the prem-
ises to the appellants James and Jarvis Dinsmoor, but
the court refused in this case to allow Nevitt any credit
whatever for any of the moneys so expended and paid
out by him, and the Appellate Court has affirmed this
part of the decree. We think this was error, and that at
least the amount as recommended by the master should
have been allowed to the trustee. Perilous, indeed, would
be the position of a trustee if the law required him to
protect and guard the trust fund in expensive and long
protracted litigation at his own expense, and, besides,
to be held liable for every unavoidable loss from a de-
crease in value of the trust property, or otherwise.

The master also reported that all of the trust prop-
erty which remained in the hands of the trustee was 64¼
acres of land, which was bid in and purchased by him at
a foreclosure sale. This was property, as we understand
the record, that had been included in the "south mort-
gage" securing two notes of James H. Woodburn, aggre-
gating, of principal, $4753. This land was purchased at
the foreclosure sale by Nevitt for $6945, which was the
amount of principal, interest and costs due under the de-
cree. The circuit court ordered Nevitt to convey this
land to his successor in trust named in the decree, and
he was credited on his account with $4753, the amount of
the principal of the trust fund invested in said land. In
this the decree was correct. While it was purchased by
Nevitt for a greater sum, viz., $6945, all of that amount
in excess of $4753 represented the interest on the latter
sum belonging to the widow, and the court costs, which
costs have been allowed as a credit in the account of
Nevitt. We do not understand that it was intended by
the decree that the new trustee should, upon the con-
veyance to him, hold this land as representing only the
principal of the trust fund and all belonging to the com-
plainants. But as the widow, Phebe A. Woodburn, is not

in this court asking us to pass upon the decree respecting her interests, nothing more need be said on that branch of the case.

Nor is any question raised as between the trustee, or James and Jarvis Dinsmoor, on the one side, and Phebe A. Woodburn on the other, respecting the interest fund invested in this tract of land, but the question arises, as between Nevitt and James and Jarvis Dinsmoor, as to the correctness of the decree in directing that the amount found to be due to the fund from them should, when collected, be credited to Nevitt. We are of the opinion that in this respect the decree is correct, and that James and Jarvis Dinsmoor are primarily liable. They were the professional advisers of Nevitt when they received the money. The money was paid directly to them by the master, with knowledge by them that it was a part of the trust fund, and they applied $979.01 of it to pay Mrs. Woodburn's debt of that amount to them, on her order to the trustee. This was doubtless done by them on the mistaken theory that it was money due Mrs. Woodburn and not to the principal fund, with the concurrence of Nevitt. While Nevitt is undoubtedly liable to the complainants for this diversion of the fund, still the bill proceeded on the theory that the fund should be traced, as far as practicable, to the parties who had received it with knowledge of its trust character, and should be recovered from them, and the decree so provided. In view of all of the facts, and that Nevitt acted under the advice of his counsel and allowed them to retain the amount to satisfy a claim belonging to them in which he had no interest, we are of the opinion that it is not error to require them to pay such money back for the benefit of the fund, and when so paid that it should be credited to and deducted from the total amount ordered to be paid by Nevitt, and that the decree in this respect was not erroneous.

The record is by no means clear as to what disposition was made by Nevitt of all moneys collected or received by him.. It was his duty to keep proper and intelligible books of account. It was also his duty to preserve the amount of the trust fund intact in his hands, or to show good cause for its diminution. This he did not do, and all of the fund secured by the "north mortgage," and the $2180 reserved in lieu of Mrs. Woodburn's notes, and the $166 received from Sanborn, have been dissipated. We find, however, that $699.50 of the fund was properly paid to James and Jarvis Dinsmoor for their services in the litigation to preserve the fund, and that neither they nor Nevitt should be required to restore it; that the decree should have found that he received $9459.27, and credited him with $4753 invested in the land ordered to be conveyed to the new trustee, and with $1244.58 properly paid by him out of the principal fund, leaving a balance to be paid by him, if nothing should be collected from James and Jarvis Dinsmoor, of $3461.69, but to be reduced by the amount which should be collected from said Dinsmoors, and that the amount, $1693.71, which said decree appealed from ordered to be paid by them, should be reduced by deducting therefrom $699.50 which they properly received from the fund, leaving a balance due from them of $993.50, which they should be required to pay.

The judgment of the Appellate Court and the decree of the circuit court will be reversed and the cause remanded to the circuit court, with directions to enter a modified decree in accordance with the views we have herein expressed. The parties, the appellants and appellees, will each pay one-half of the costs in this court.

*Reversed and remanded, with directions.*